Robert J. MARTIN, et al., Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.

No. CIV.A. 02–0055(RWR).

United States District Court, District of Columbia.

April 11, 2002.

---

## MEMORANDUM OPINION

ROBERTS, District Judge.

Plaintiffs, Robert J. Martin and the Government Accountability Project ("GAP"), allege that the U.S. Environmental Protection Agency ("EPA") and the EPA Administrator, Christine Todd Whitman, plan to violate their First Amendment rights by moving Martin, who is the EPA National Ombudsman ("Ombudsman"),[1] from the Office of Solid Waste and Emergency Re-

1. The parties dispute the Ombudsman's exact title. Plaintiffs refer to the Ombudsman as the National Ombudsman, while defendants refer to him as the Solid and Hazardous Waste Ombudsman. (Compl. ¶ 4.1; Defs.' Mot. to Dismiss or, in the Alternative for Summ. J. ("Mot. to Dismiss") at 3.)

sponse ("OSWER") to the Office of the Inspector General ("OIG"). Defendants have moved to dismiss plaintiffs' claims. Because Martin has failed to exhaust administrative remedies, his First Amendment claim will be dismissed pursuant to Fed.R.Civ.P. 12(b)(1), and because GAP has failed to state a claim upon which relief can be granted, its First Amendment claim will be dismissed pursuant to Fed. R.Civ.P. 12(b)(6).

### BACKGROUND

The EPA's Ombudsman position was created by the 1984 Amendments to the Resource Conservation and Recovery Act. (Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. ("Mot. for P.I.") at 4.) The statutory authority for the position lapsed in 1988, but the EPA has continued to maintain an Ombudsman position as a matter of policy. (Pl.'s Mem. in Supp. of Mot. for T.R.O. and Prelim. Inj. ("Mot. for T.R.O."), Decl. of Martin at 2.) The Ombudsman is supposed to respond to citizen concerns, assist businesses in complying with regulations, provide information, and investigate complaints about relevant EPA programs. (Mot. for P.I. at 4.) GAP is a public interest organization that supports "employees who exercise their right of conscience to expose fraud, waste, mismanagement, abuse of authority and illegality in the workplace. In addition to providing legal representation to whistleblowers, GAP uses information provided by them to mount national and Congressional campaigns to reform targeted agencies." (Compl.¶ 3.2.)

Martin has filled the Ombudsman position since 1992. (Mot. for P.I. at 4.) He has been a strong critic of both the EPA and, more recently, Administrator Whitman. Plaintiffs allege that Martin's criticisms finally drew the ire of the defendants when an EPA investigator working with Martin, Hugh Kaufman, released evidence that he and Martin had gathered allegedly establishing that the Administrator had a conflict of interest in the cleanup efforts of the Shattuck Chemical Superfund Site in Colorado. (*Id.* at 5–6.) This evidence allegedly showed that the Administrator's husband had financial ties to Citigroup, which has become a part of the Shattuck investigation, and that both the Administrator and her husband would financially benefit from a favorable settlement of the Shattuck investigation. On March 11, 2001, the Denver Post published an article that called into question EPA's decision-making and that featured Martin's investigation and quotations from Kaufman. (*Id.* at 6.)

Plaintiffs argue that shortly after learning of the article, defendants began taking adverse personnel actions that greatly curtailed Martin's authority and investigatory capabilities. (*Id.* at 7.) The plaintiffs allege two specific adverse personnel actions in their complaint. The first occurred in March of 2001, when Martin's supervisor informed him that Kaufman would no longer be able to assist him in investigating a Superfund site in Pennsylvania. (Compl.¶ 4.15.) The second adverse personnel action, and the action that forms the basis of this suit, occurred on November 27, 2001, when the Administrator issued a memorandum directing that the Ombudsman position be moved from OSWER to OIG. (*Id.* ¶ 4.25.) Plaintiffs allege that the move will result in Martin having significantly less office space, and the complaint seems to imply, without specifically alleging, that the move will stop ongoing investigations and result in Martin's active files being seized. (*Id.* ¶¶ 4.37, 6.1.) The complaint does not allege that this move will prevent Martin from continuing to speak to the public.

Defendants' motivation for the proposed move to OIG is hotly contested. Plaintiffs argue that this move is the culmination of

defendants' campaign against him which started in March of 2001 and was exacerbated by reports of the Administrator's potential conflicts in the cleanup of a Pennsylvania Superfund cite and Martin's October 10, 2001 report criticizing the EPA's handling of cleanup plans for the same Pennsylvania Superfund site. (Mot. for P.I. at 7–9.) Defendants claim that the decision to move the Ombudsman position was prompted by a General Accounting Office ("GAO") report, which concluded that the Ombudsman did not have sufficient independence in OSWER. (Mot. to Dismiss at 5–8.) Defendants argue that OIG has the type of organizational independence called for by GAO. (*Id.*)

On Thursday, January 10, 2002, four days before the Ombudsman position was scheduled to be moved, plaintiffs successfully sought a temporary restraining order that would prevent the move pending full briefing on the merits of preliminary injunctive relief. Those issues and jurisdictional issues now have been fully briefed by the parties.

### DISCUSSION

Defendants have moved pursuant to Fed.R.Civ.P. 12(b)(1) to dismiss Martin's First Amendment claim that the defendants retaliated against him for his exercise of his First Amendment rights. They argue that this Court lacks subject matter jurisdiction to hear it. Additionally, defendants have moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss GAP's claim that the defendants have violated GAP's First Amendment right to receive information.[2] They argue that GAP has failed to state a claim upon which relief can be granted.

*I. Martin's Claim*

■ A dismissal pursuant to Fed. R.Civ.P. 12(b)(1) is proper where a plaintiff fails to establish by a preponderance of the evidence that subject matter jurisdiction exists. *See Tavoulareas v. Comnas,* 720 F.2d 192, 195 (D.C.Cir.1983); *Fitts v. Fed. Nat'l Mortgage Ass'n,* 44 F.Supp.2d 317, 320 (D.D.C.1999). Defendants argue that this Court does not have subject matter jurisdiction over Martin's claims because Martin has failed to exhaust administrative remedies available to him under the Civil Service Reform Act of 1978 ("CSRA"), Pub.L. 95–454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.). If so, Martin was required to challenge defendants' actions with the Office of the Special Counsel ("OSC"), *see* 5 U.S.C. § 1214(a)(1)(A) (West 2000); *Weaver v. United States Info. Agency,* 87 F.3d 1429, 1433 (D.C.Cir.1996), and nothing in the record suggests that he has done so.

■ The CSRA was enacted to replace the haphazard system of administrative and judicial remedies available to civil service employees who suffered an adverse personnel action with a comprehensive remedial scheme. *See United States v. Fausto,* 484 U.S. 439, 444, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). "The available remedies vary according to the employee's position and the action being challenged. This variance reflects an attempt to strike a balance between protecting the rights of federal employees and allowing for an efficient government." *McGregor v. Greer,* 748 F.Supp. 881, 884 (D.D.C.1990).

■ Congress intended for civil service employees to take advantage of this comprehensive, remedial scheme. According-

---

**2.** The complaint broadly asserts that "[p]laintiffs state a claim for violation of the First Amendment of the United States Constitution." (Compl.¶ 5.2.) Although the complaint is not clear on how many causes of action the plaintiffs assert, in subsequent filings and arguments, both parties have treated the complaint as stating the two causes of action set out above.

ly, "[u]nder the CSRA, exhaustion of administrative remedies is a jurisdictional prerequisite to suit." *Weaver*, 87 F.3d at 1433.

Plaintiffs do not dispute the jurisdictional nature of the CSRA exhaustion requirement. Instead, they make two arguments: 1) "[w]here harm is imminent and irreparable, the claim is purely constitutional, and the only effective remedy is emergency equitable relief preserving the status quo, then exhaustion is inappropriate, there being no 'equally effective' remedy available," and 2) Martin has no administrative remedy because the United States Court of Appeals for the Federal Circuit has exempted the types of disclosures Martin made from the protections of the Whistleblower Protection Act ("WPA") of 1989, Pub.L. No. 101–12, 103 Stat. 16 (codified as amended in scattered sections of 5 U.S.C.), leaving Martin no obligation to follow CSRA exhaustion requirements.[3] (Pls.' Mem. of P. & A. in Opp'n to Defs.' Mot to Dismiss or, in The Alternative for Summ. J. at 2–4.)

## A. EXHAUSTION

Plaintiffs cite no case law establishing the proposition that one who has a purely constitutional claim and alleges an imminent and irreparable harm need not exhaust his administrative remedies under the CSRA. "[L]ong before the passage of the CSRA [the D.C. Circuit] held that when a constitutional claim is intertwined with a statutory one, and Congress has provided machinery for the resolution of the latter, a plaintiff must first pursue the administrative machinery." *Steadman v. Governor, United States Soldiers' and Airmen's Home*, 918 F.2d 963, 967 (D.C.Cir. 1990).

■ A plaintiff is generally required to exhaust administrative claims when the CSRA provides a fully effective remedy. *Weaver*, 87 F.3d at 1434–35. "Only in the unusual case in which the constitutional claim raises issues totally unrelated to the CSRA procedures can a party come directly to district court." *Steadman*, 918 F.2d at 967.

The "unusual case" contemplated by *Steadman* is one in which the constitutional claim is independent of the facts of the underlying adverse personnel action. For example, a plaintiff is not required to exhaust administrative remedies when he challenges the constitutionality of a regulation pursuant to which an adverse personnel action has been taken, or makes a constitutional challenge to the authority of employees of an agency to issue regulations or to develop policy where the regulation or policy has led to an adverse personnel action. *See Weaver*, 87 F.3d at 1432–35 (holding that because a district court would have jurisdiction over a suit, if it were framed as a pre-enforcement attack on a regulation restricting employee speech, plaintiff would not be required to exhaust her CSRA remedies where she alleged that a regulation violated her First

---

**3.** Both the WPA and the CSRA are scattered throughout Title 5 of the United States Code. A provision of the WPA that makes it a prohibited personnel practice to retaliate against whistleblowers is codified at 5 U.S.C. § 2302(b)(8). Though § 2302(b)(8) is a codification of the WPA, the rest of § 2302 is largely derived from the CSRA and includes the personnel practices that are prohibited by the CSRA as well. *Compare* Pub.L. 95–454, 92 Stat. 1111 *with* § 2302. An employee who wishes to assert a claim under § 2302 must exhaust administrative remedies regardless of whether the provision of § 2302 under which he alleges he has a grievance was derived from the CSRA or the WPA. *See* 5 U.S.C. §§ 1214(a)(1)(A), 2302(a)(1). Martin's argument, apparently, is that § 2302(b)(8), which is technically a provision of the WPA, is the only provision of § 2302 that could address his claim and that his conduct is not protected under § 2302(b)(8) against employer retaliation.

Amendment rights); *Andrade v. Lauer*, 729 F.2d 1475, 1490–93 (D.C.Cir.1984) (holding that plaintiffs need not exhaust their administrative remedies under the CSRA before filing suit in federal district court because the policy concerns mandating exhaustion were not present when plaintiffs had challenged the defendants' constitutional authority to issue regulations).

■ Here, Martin seeks judicial review of the constitutionality of defendants' decision to take an allegedly adverse personnel action against him. His claim is not, though, a constitutional claim factually independent of the adverse personnel action such that it would obviate the need for him to exhaust his administrative remedy before seeking relief on the constitutional claim in federal district court.

■ The exhaustion requirement exists because it serves four important purposes. First, it prevents litigants from circumventing Congress' carefully crafted remedial scheme. Second, it gives agencies the opportunity to correct their own mistakes or to exercise the discretion they have been granted. Third, it eases the burden on the federal judiciary by allowing the parties and the agency to develop the facts in an administrative forum. Finally, it will either focus the issues for judicial review or settle the dispute so that judicial review will become unnecessary. *See Andrade*, 729 F.2d at 1484.

The reasons for requiring exhaustion apply to Martin's claim. Allowing him to sue directly in federal district court would permit him to circumvent Congress' carefully crafted administrative procedures for remedying adverse personnel action. Hearing this claim before the OSC has had a chance to investigate it would deny the EPA the opportunity to either correct its own mistakes or explain whether the decision was within the EPA's discretion. Also, it would, contrary to Congress' de-

sign, require this Court, and not the OSC, to develop the facts of the allegedly adverse personnel action. Finally, direct review would eliminate the opportunities to have the issues focused, or potentially resolved, by the OSC first.

■ Martin also argues, however, that exhaustion is not required where the plaintiff seeks injunctive relief from an allegedly immediate and irreparable harm. The argument that an administrative remedy is ineffective, merely because an agency cannot provide injunctive relief, has been summarily rejected by the D.C. Circuit. *See Weaver*, 87 F.3d at 1434 (finding that CSRA remedy is not ineffective merely because an agency cannot provide injunctive relief). If Martin is attempting to distinguish *Weaver* by arguing that his remedy is ineffective because he cannot obtain *preliminary* injunctive relief, his argument fails to recognize the administrative remedies potentially available to him. The CSRA provides a procedure for obtaining a stay which, like injunctive relief, could prevent defendant from transferring Martin before the OSC has had an opportunity to determine, in a final decision, whether a prohibited personnel action occurred. *See* 5 U.S.C. § 1214(b).

Martin was required to exhaust whatever administrative remedies he had before suing in federal district court.

### B. COVERAGE UNDER § 2302

■ Martin claims that he is not required to exhaust administrative remedies because his communications are not protected by § 2302(b)(8). Section 2302(b)(8) of Title 5 protects an employee who, broadly speaking, discloses information that the employee believes shows a violation of a regulation or law or demonstrates abuses of the agency's responsibilities and duties to the public. It provides, in relevant part:

(b) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority-

.         .         .         .         .

(8) take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of-

(A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences-

(i) a violation of any law, rule, or regulation, or

(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety,

if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs[.]

5 U.S.C. 2302(b)(8).

Martin argues that the United States Court of Appeals for the Federal Circuit has held that the types of disclosures he allegedly made are not protected by § 2302(b)(8).[4] The Federal Circuit, based on its review of the legislative history of the WPA, held that the protections afforded by § 2302(b)(8) are not applicable to employees who claim they were retaliated against for making normal disclosures in accordance with their job requirements because § 2302(b)(8) "was established to protect employees who go above and beyond the call of duty and report infractions of law that are hidden." *Huffman v. Office*

*of Pers. Mgmt.*, 263 F.3d 1341, 1353 (Fed. Cir.2001).

Essentially, Martin argues he should not be required to challenge defendants' actions with the OSC because it would be futile for him to do so. His argument fails for three reasons. First, Martin cannot know before seeking OSC review, whether the OSC would determine that the disclosures for which he is allegedly being retaliated against are normal disclosures that were made in accordance with being the National Ombudsman. Second, even if *Huffman* bars relief under § 2302(b)(8) for the types of disclosures made by him, Martin provides no case law or analysis to support his proposition that an employee subject to the CSRA is not required to exhaust administrative claims when it would be futile to do so.

■    Finally, even if a futility exception existed to Martin's exhaustion requirements, Martin ignores the fact that the types of statements and disclosures he alleges he has made are protected at least by a more general provision of § 2302. The merit system principles, 5 U.S.C. § 2301, require federal personnel management to be conducted consistent with employees' constitutional rights. Section 2301 provides, in relevant part:

(b) Federal personnel management should be implemented consistent with the following merit system principles:

.         .         .         .         .

(2) All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management ... with

---

**4.** The United States Courts of Appeals for the Federal Circuit ultimately can hear appeals from certain complaints investigated by the OSC, including those filed under § 2302(b)(8), and adjudicated by the Merit Systems Protection Board ("MSPB"). *See* 5 U.S.C. §§ 1221, 7703(a).

proper regard for their privacy and constitutional rights.

5 U.S.C. § 2301(b). A personnel action that violates this merit system principle is a prohibited personnel action that triggers the exhaustion requirement. *See* 5 U.S.C. § 2302(a)(1), (b)(12); *Weaver,* 87 F.3d at 1432–33 (stating that plaintiff, who did not challenge with the OSC a personnel action prohibited by § 2302(b)(12) failed to satisfy her administrative exhaustion requirement). The D.C. Circuit has explained that personnel actions taken in violation of employees' First Amendment speech rights are prohibited by § 2302(b)(12). *See Weaver,* 87 F.3d at 1432.

Martin's failure to exhaust his administrative remedies has not been justified. He has not satisfied this jurisdictional prerequisite to suing in federal district court. Therefore, Martin's First Amendment claim will be dismissed pursuant to Fed. R.Civ.P. 12(b)(1).

## II. *GAP's Claim*

Defendants have moved to dismiss Martin's claim that defendants retaliated against him for the exercise of his First Amendment rights, and GAP's claims that defendants have engaged in conduct that has violated GAP's First Amendment right to receive information. Because Martin's claim will be dismissed for lack of subject matter jurisdiction, the Court need consider only defendants' motion to dismiss GAP's First Amendment claim.

■■■■ In considering a motion to dismiss for failure to state a cause of action, all factual allegations in the complaint must be taken as true and ambiguities and doubts must be resolved in favor of the pleader. *See Gregg v. Barrett,* 771 F.2d 539, 547 (D.C.Cir.1985) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). However, "[a] court must dismiss a complaint where, even assuming all the factual allegations

are true, the plaintiff has failed to establish a right to relief based upon those facts." (*Id.*)

■■■■ The First Amendment protects the right to receive information from a willing speaker. "Freedom of speech presupposes a willing speaker. But where a speaker exists . . ., the protection afforded is to the communication, to its source and to its recipients both." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The right to receive information "is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution" because "the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them." *Bd. of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pico,* 457 U.S. 853, 867, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (emphasis in original). The right to receive information is, therefore, derivative of the First Amendment rights of the speaker. *See Ctr. for Reprod. Law & Policy v. Bush,* No. 01 CIV. 4986(LAP), 2001 WL 868007, at *9 (S.D.N.Y. July 31, 2001). Because of this right to receive information, a cause of action exists under the First Amendment which allows a recipient to allege that government conduct has chilled the speech of a willing speaker. *See Taylor v. Resolution Trust Corp.,* 56 F.3d 1497, 1508 (D.C.Cir.1995).

■■■■ A speaker's speech is chilled when an otherwise willing speaker is prevented from speaking, or cajoled into no longer speaking, by government conduct. *See, e.g., id.* at 1508 (holding that district court's finding that plaintiffs' speech had not been chilled because they had overcome any reluctance to speak that might have resulted from defendant's conduct was not clearly erroneous or contrary to law). If a recipient can establish a willing

speaker has been chilled, the inquiry turns to whether the speech has been chilled for a constitutionally impermissible reason. *See Pico,* 457 U.S. at 872–75, 102 S.Ct. 2799 (addressing factual question of whether school board exercised its discretion in a constitutionally impermissible manner only after determining that the school board had chilled the speech of authors by banning books).

■ "The right to receive information is not as broad as the right of free speech from which it stems." *Student Press Law Ctr. v. Alexander,* 778 F.Supp. 1227, 1233 (D.D.C.1991). While the First Amendment protects an individual's right to speak on whatever subject he or she chooses, the First Amendment does not protect an individual's right to receive information on every subject. As such, "[t]he right to receive information . . . is not established in every case where a person wishes to receive information." *Gregg,* 771 F.2d at 547. A plaintiff does not state a First Amendment violation by simply claiming that he was denied government information he wanted, because " '[t]here is no constitutional right to have access to particular government information, or to require openness from the bureaucracy.' " *Houchins v. KQED, Inc.,* 438 U.S. 1, 14, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (quoting Stewart, *Or of the Press,* 26 Hastings L.J. 631, 636 (1975)).

■ Thus, the First Amendment does not require the government to provide access to information it possesses on demand, and it certainly does not require the government to gather information. *See Gregg,* 771 F.2d at 547; *Kline v. Republic of El Salvador,* 603 F.Supp. 1313, 1319 (D.D.C.1985). The First Amendment right to receive information requires only that the government not engage in conduct that impermissibly silences a willing speaker. Accordingly, when a First Amendment claim fails to allege that a willing speaker's speech has been chilled, the claim should be dismissed for failing to state a claim. *Gregg,* 771 F.2d at 546–49.

■ Here, GAP has not alleged that Martin is no longer willing to speak with the public on issues he was previously willing to discuss. Instead, the complaint seems to assert that the quality of Martin's speech will be diminished by his transfer because 1) cuts in staffing will prevent him from investigating as effectively as before; 2) his new office space will not give him the space he needs to properly conduct investigations; 3) his ongoing investigations will be terminated; and 4) his active files will be seized. (Compl.¶¶ 4.15, 4.37, 6.1.)

Assuming all of these allegations to be true, as I must for purposes of a motion to dismiss under Rule 12(b)(6), GAP has failed to state a claim upon which relief can be granted. While these allegations might establish that Martin is losing some of his investigatory independence or that Martin will no longer be able to cite from the same government files when he speaks, they do not establish that Martin will no longer speak to the public as he had before the transfer. Plaintiff's "quality of speech" argument amounts to the assertion that the First Amendment requires the government to both gather and provide information—an argument that has been definitively rejected. *See Houchins,* 438 U.S. at 14, 98 S.Ct. 2588; *Gregg,* 771 F.2d at 547. As such, GAP's First Amendment claim fails to state a cause of action.

## CONCLUSION

Because Martin has failed to exhaust administrative remedies for the allegedly adverse personnel action taken against him, this Court does not have subject matter jurisdiction over that claim and defendants' motion to dismiss pursuant to Fed.

R.Civ.P. 12(b)(1) will be granted.  Defendants' motion to dismiss GAP's First Amendment claim pursuant to Fed. R.Civ.P. 12(b)(6) will be granted because GAP has failed to allege a First Amendment violation of its right to receive information.  A final order consistent with this memorandum opinion will be issued.