725 S.E.2d 756

**MEN & WOMEN AGAINST DISCRIMINATION, A West Virginia Corporation, Plaintiff Below, Appellee**

v.

**The FAMILY PROTECTION SERVICES BOARD, Judi Ball, Barbara Hawkins, Kathie King, Judy King Smith, and Lora Maynard, Defendants Below, Appellants.**

No. 35558.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 8, 2011.

Decided May 26, 2011.

ty, West Virginia. The Board is a public body created by the West Virginia Domestic Violence Act, West Virginia Code §§ 48–26–101 to .–1101 (2009 & Supp.2010) ("WVDVA"). Among other things, the Board is charged with establishing and enforcing standards for the licensure of all domestic violence shelters and family protection programs in West Virginia, and funding such shelters and programs once they become licensed. W. Va.Code § 48–26–401. The Board is also charged with licensing programs to treat perpetrators of domestic violence. *Id.* at § 48–26–404.

Respondent herein and plaintiff below, Men and Women Against Discrimination ("MAWAD"), describes itself as

> a non-profit charitable corporation organized to protect the rights of children under the age of eighteen years to access and relationship [sic] with both parents regardless of gender and to promote fairness and gender equality in the implementation of the purposes of the West Virginia Domestic Violence Act and the manner in which services are provided pursuant to that Act to the citizens of the State of West Virginia.

In June 2008, MAWAD filed a Complaint in the Circuit Court of Kanawha County alleging that the Appellants are implementing the WVDVA in a discriminatory manner and seeking to enjoin them from distributing funds to shelters and family protection programs until the alleged discriminatory practices have been addressed. On October 2, 2009, the circuit court entered summary judgment in favor of MAWAD, rendering "null and void" three legislative rules promulgated by the Board: C.S.R. §§ 191–2–1, 191–2–4.11 and 191–3–3 (2003). After fully reviewing this matter,[1] this Court reverses the circuit court's final order and remands for entry of an order dismissing the action for lack of standing.

Darryl V. McGraw, Jr., Esq., Attorney General, State of West Virginia, Charleston, WV, and Robert M. Bastress, Jr., Esq., Special Assistant Attorney General, Morgantown, WV, for Appellants.

Harvey D. Peyton, Esq., Peyton Law Firm, PLLC, Nitro, WV, for Appellee.

William D. Turner, Esq., Pyles & Turner, LLP, Lewisburg, WV, for Amicus Curiae West Virginia Coalition Against Domestic Violence, Inc., National Network to End Domestic Violence, Domestic Violence Legal Empowerment and Appeals Project, and Battered Women's Justice Project.

Helen Gerostathos Guyton, Esq., Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, DC, for Amici Curiae National Network to End Domestic Violence, Domestic Violence Legal Empowerment and Appeals Project, and Battered Women's Justice Project.

PER CURIAM:

The appellants herein and defendants below, the Family Protection Services Board ("the Board"), Judy King Smith, Chairperson of the Board, Judi Ball, Secretary/Treasurer of the Board, and Kathie King, Lora Maynard and Barbara Hawkins, all members of the Board (jointly "the Appellants"), appeal from the entry of summary judgment against them by the Circuit Court of Kanawha Coun-

---

1. We acknowledge the contributions of the amici curiae in this case, which filed briefs in support of the Appellants. One brief was filed on behalf of the West Virginia Coalition Against Domestic Violence, Inc., and a second brief was filed on behalf of three national organizations: National Network to End Domestic Violence, Domestic Violence Legal Empowerment and Appeals Project, and Battered Women's Justice Project.

## I. FACTS AND PROCEDURAL HISTORY

MAWAD does not allege any actual instances of discrimination; rather, it challenges the Board's legislative rules as discriminatory on their face and, therefore, in conflict with the legislative intent underlying the WVDVA. Accordingly, a review of the WVDVA and the Board's legislative rules implementing that Act is necessary.

The Board, which is legislatively established by the WVDVA, consists of five members who are charged with facilitating "the formation and operation of shelters," establishing a system of licensure for shelters and family protection programs, and evaluating shelters and programs annually. W. Va. Code § 48–26–401(3), (9), (11) & (13). A "shelter" is "a licensed domestic violence shelter created for the purpose of receiving, on a temporary basis, persons who are victims of domestic violence, abuse or rape as well as the children of such victims." *Id.* at § 48–26–204. A "family protection program" is a "licensed domestic violence program offered by a locally controlled organization primarily for the purpose of providing services to victims of domestic violence or abuse and their children." *Id.* at § 48–26–206.

The Board is further charged with distributing proceeds from a special revenue fund, known as the West Virginia Family Protection Fund, to licensed shelters and family protection programs. *Id.* at §§ 48–26–401(12) & –601. Shelters and family protection programs that apply for such funding must meet certain criteria. Among other things, shelters and family protection programs must be incorporated as non-profits, have boards of directors, receive at least 55% of their funding from sources other than the Board, and require their employees and volunteers to maintain confidentiality about the individuals they serve. *Id.* at § 48–26–601(b)(2)–(5). Importantly, a shelter or program may not be funded, or will lose funding, if it discriminates on the basis of "race, religion, age, *sex*, marital status, national origin or ancestry." *Id.* at § 48–26–601(c) (emphasis added).

In addition to licensing and funding domestic violence shelters and family protection programs, the Board is also charged with regulating "programs of intervention for perpetrators of domestic violence" ("PIPs"). W. Va.Code § 48–26–404(a). Among other things, the Board must establish "criteria concerning a perpetrator's appropriateness for the program," "systems for communication and evaluation among the referring court, the public and private agencies that provide programs for victims of domestic violence and the programs of intervention for perpetrators," and "required qualifications concerning education, training and experience for providers of intervention programs." *Id.* at § 48–26–404(b). Furthermore, as with domestic violence shelters, the Board is charged with issuing annual licenses to providers of PIPs. *Id.* at § 48–26–405.

To accomplish these goals, the WVDVA authorizes the Board to promulgate a series of legislative rules. *Id.* at § 48–26–403. "A regulation that is proposed by an agency and approved by the Legislature is a 'legislative rule' as defined by the State Administrative Procedures Act, *W. Va.Code,* 29A–1–2(d) [1982], and such a legislative rule has the force and effect of law." Syl. Pt. 5, *Smith v. W. Va. Human Rights Comm'n,* 216 W.Va. 2, 602 S.E.2d 445 (2004). The rules promulgated by the Board, which have been approved by the Legislature, are found at West Virginia Code of State Rules ("C.S.R.") §§ 191–1 to –5.

Pursuant to the Board's legislative rules, all family protection programs, domestic violence shelters and PIPs must be licensed by the Board in order to provide services to domestic violence victims or perpetrators in West Virginia. W. Va.C.S.R. § 191–1–5. The Board may seek an injunction against any organization attempting to provide such services without a license. *Id.* at § 191–1–5.1e. Moreover, the Board must conduct annual evaluations of all programs, shelters and PIPs, and it retains the authority to revoke licenses or otherwise suspend such organizations. *Id.* at §§ 191–1–5.3 & 5.6.

West Virginia Code of State Rules § 191–2–3 sets forth the requirements that family protection programs must meet in order to be licensed. Among other things, family

protection programs must provide services including case management, advocacy, counseling and referral to other community resources. *Id.* at § 191–2–3.1.f. Furthermore, such programs must be governed by a board of directors and meet certain requirements with regard to their paid staff. *Id.* at § 191–2–3.2. Of importance to this case, a family protection program will not be licensed unless *"at least one-third of its direct service providers are certified by the West Virginia Coalition Against Domestic Violence as Domestic Violence Advocates." Id.* at § 191–2–3.2.k.12 (emphasis added). To be a "domestic violence advocate," a person must be "approved by the Board of Directors of West Virginia Coalition Against Domestic Violence as meeting the eligibility standards outlined in the Coalition's Domestic Violence Advocate Certification Program." *Id.* at § 191–2–2.2.

In addition to meeting the criteria set forth for family protection programs, shelters must meet certain additional standards to be licensed. *Id.* at § 191–2–4. For example, shelters must meet applicable state and federal health and safety standards, *id.* at § 191–2–4.3, and provide comfortable and hygienic facilities for the residents. *Id.* at §§ 191–2–4.4 to –4.10. Of particular importance in this case, shelters

> shall have a written process for obtaining alternative lodging to house victims of domestic violence and their children when the residential facility is filled to capacity or is unable to accommodate special needs populations, including, but not limited to, victims who are: elderly, have disabilities, *or who are adult and adolescent males.*

*Id.* at § 191–2–4.11 (emphasis added).

Finally, C.S.R. § 191–3–3 sets forth requirements for the licensure of PIPs. Like shelters, PIPs must have a board of directors and their staff must meet certain qualifications. For example, "individuals providing professional or therapeutic counseling, and/or professional social work" must have "appropriate credentials and [be] licensed when applicable." *Id.* at § 191–3–3.2.k.11. Moreover, all educators and facilitators at PIPs "shall have a minimum of 30 hours of training approved by the Board," which is to include

training on several principles. *Id.* at § 191–3–3.3.a. The training must include information on lethality assessments for risks of homicide; state and federal domestic violence laws; the role of a facilitator in a group; the effects of domestic violence on victims and their children; and "the dynamics of domestic violence within the context of power and control." *Id.* In addition, the training shall include *"[t]he understanding that domestic violence is deeply rooted in historical attitudes toward women and is intergenerational." Id.* at § 191–3–3.3.a.3 (emphasis added).

In the instant case, MAWAD contends that several of the regulations promulgated by the Board conflict with the legislative intent underlying the WVDVA, both by discriminating on the basis of gender in shelters and PIPs and by infringing on MAWAD's First Amendment free speech rights. Specifically, MAWAD asserts that the regulations governing the licensure of shelters discriminate against male victims of domestic violence because men are treated as a "special needs population" for whom alternative lodging may be sought. It further argues that the regulations governing the licensure of PIPs is discriminatory, because it requires employees of PIPs to undergo training that includes the "understanding that domestic violence is deeply rooted in historical attitudes towards women and is intergenerational."

Finally, MAWAD contests the requirement that, to be licensed, one-third of a family protection program's direct service providers must be certified "domestic violence advocates," because such certification is available only through a private organization, the West Virginia Coalition Against Domestic Violence ("the Coalition"). As stated in the Complaint, MAWAD contends:

> The actions of the Defendants in delegating all funding and certification authority over domestic violence advocacy and domestic violence programs to the West Virginia Coalition Against Domestic Violence deprive [MAWAD] and its constituents of an opportunity for free expression of their speech, thoughts and ideas relative to domestic violence by depriving them of even the opportunity to attain certified domestic violence advocate status or even

the opportunity to apply for funding, all of which constitutes unlawful prior restraint upon the Plaintiff's fundamental Constitutional rights of free speech.

Thus, MAWAD asserts that the Board's legislative rule requiring one-third of a family protection program's direct service providers to be licensed domestic violence advocates violates MAWAD's First Amendment free speech rights.[2]

After MAWAD filed its Complaint in the circuit court, the parties engaged in discovery and, in June 2009, filed cross-motions for summary judgment. In their motion, the Appellants challenged MAWAD's standing to bring these claims. The circuit court rejected this argument, however, finding that standing exists in this case because, "[s]tanding requirements are relaxed in First Amendment cases where 'an overbroad statute [acts] to 'chill' the exercise of rights guaranteed protection.' *United States v. Blaszak*, 349 F.3d 881, 888 (6th Cir.2003)." The circuit court additionally concluded that several sections of the Board's legislative rules conflict with the legislative intent expressed in the WVDVA, because they require licensed shelters and PIPs to engage in sex discrimination. The circuit court concluded its order by rendering three specific rules null and void, stating:

> Because the provisions of the defendant's Rule 191–2–1, Rule 191–to–4.11 [sic] and Rule 191–3–3 conflict with the express intention of the legislation that authorized the promulgation of these rules, and further because the continued implementation of these rules has an actual well-founded and real chilling effect on the plaintiff and its constituent members' exercise of their First Amendment rights to advocate the gender-neutral nature of domestic violence

programs in the state of West Virginia, these rules are null and void.

The Appellants now appeal from this October 2, 2009, order entering summary judgment in favor of MAWAD.[3]

## II. STANDARD OF REVIEW

■ This case is before this Court on appeal of the circuit court's entry of summary judgment in favor of MAWAD. "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

■ In considering the validity of legislative rules promulgated by the Board, we give those rules the same weight as we would give a statute.

> Once a disputed regulation is legislatively approved, it has the force of a statute itself. Being an act of the West Virginia Legislature, it is entitled to more than mere deference; it is entitled to controlling weight. As authorized by legislation, a legislative rule should be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious.

Syl. Pt. 2, *W. Va. Health Care Cost Review Auth. v. Boone Mem'l Hosp.*, 196 W.Va. 326, 472 S.E.2d 411 (1996).

## III. DISCUSSION

■ As a threshold issue, this Court must consider whether MAWAD has standing to bring these claims. "Standing is a jurisdictional requirement that cannot be waived, and may be brought up at any time in a proceeding." Franklin D. Cleckley, Robin J. Davis & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure* § 12(b), at 21 (Supp.2004). Although the Appellants do not assign error

---

2. In its Complaint, MAWAD additionally argued that the Board "unlawfully delegated the appropriation of public funds into the hands of a private entity, i.e. the West Virginia Coalition Against Domestic Violence," in violation of Article V, Section I of the Constitution of West Virginia, which sets forth the division of powers between the three branches of government. It further asserted that the alleged unlawful delegation of duties to the Coalition violates Article II, Section IV of West Virginia's Constitution,

which contains the State's the equal protection clause. The circuit court did not make any findings of fact or conclusions of law based on either of these constitutional provisions, however, nor did MAWAD raise either of these arguments in its brief on appeal.

3. On April 14, 2010, this Court entered an order staying the circuit court's final order, pending resolution of the appeal.

in this appeal to the circuit court's ruling on standing, this Court must address this issue nonetheless.[4]

Where neither party to an appeal raises, briefs, or argues a jurisdictional question presented, this Court has the inherent power and duty to determine unilaterally its authority to hear a particular case. Parties cannot confer jurisdiction on this Court directly or indirectly where it is otherwise lacking.

Syl. Pt. 2, *James M.B. v. Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995); *see also State ex rel. Abraham Linc Corp. v. Bedell*, 216 W.Va. 99, 111, 602 S.E.2d 542, 554 (2004) (Davis, J., concurring) ("The decisions of this Court and other jurisdictions have pointed out that an appellate court has the inherent authority and duty to *sua sponte* address the issue of standing, even when the parties have failed to raise the issue at the trial court level or during a proceeding before the appellate court.").

■ "[S]tanding is defined as '[a] party's right to make a legal claim or seek judicial enforcement of a duty or right.' " *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 94, 576 S.E.2d 807, 821 (2002) (*quoting* Black's Law Dictionary 1413 (7th ed.1999)).

" 'Standing is comprised of three elements: *First, the party attempting to establish standing must have suffered an 'injury-in-fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent and not conjectural or hypothetical.* Second, there must be a causal connection between the injury and the conduct forming the basis of the lawsuit. Third, it must be likely that the injury will be redressed through a favorable decision of the court.' Syl. pt. 5, *Findley v. State Farm Mutual Automobile Insurance Company*, 213 W.Va. 80, 576 S.E.2d 807 (2002)."

Syl. Pt. 2, *Doering v. City of Ronceverte*, 228 W.Va. 147, 718 S.E.2d 497 (2011) (emphasis added).

In the instant case, this Court must determine whether MAWAD has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent and not conjectural and hypothetical." *Id.* In a seminal case governing standing, the United States Supreme Court explained that "[b]y particularized, we mean that the injury must affect the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n. 1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). MAWAD, however, does not assert that it or any of its members have actually suffered any injury as the result of the Board's allegedly discriminatory rules. Indeed, MAWAD fails to allege even a single instance of discrimination. Moreover, MAWAD has not been refused a license or funding by the Board because MAWAD has never actually applied for such. Thus, MAWAD has failed to set forth a concrete and particularized injury which is actual and imminent. *See Doering*, 228 W.Va. 147, 718 S.E.2d 497, at Syl. Pt. 2.

The circuit court, however, found that MAWAD has standing in this case because the Board's legislative rules effectively "chill" MAWAD's speech, thus violating MAWAD's rights under the First Amendment to the United States Constitution.[5] Specifically, the circuit court found that MAWAD's ability to express its views regarding "the gender-neutral nature of domestic violence by seeking certification as certified domestic violence advocates or the operators of licensed domestic violence programs, shelters or [PIPs]," has been chilled by the Board's legislative rules governing licensure of such programs and the fact that the Coalition controls the certification of domestic violence advocates. In other words, as the circuit court stated in its final order, because the Board's rules

deprive[ ] the plaintiffs and its constituent members the opportunity to even seek cer-

---

4. While the Appellants did not raise the issue of standing on appeal, the Coalition addresses this issue in its amicus brief.

5. The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or

prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people to peaceably assemble, and to petition the Government for a redress of grievances."

tification *necessary to more legitimately convey its message* and fulfill its mission, enforcement of this rule regarding the certification of domestic violence advocates has a substantial chilling effect on the plaintiff's rights of free speech.

(Emphasis added).

To support this position, the circuit court relied on a line of federal cases which hold that standing requirements can be relaxed when a plaintiff challenges an overbroad statute that "chills" free speech. *See, e.g., Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 129–30, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). The circuit court cited to *Dambrot v. Cent. Michigan Univ.,* 55 F.3d 1177 (6th Cir.1995), which explains that the "overbreadth doctrine provides an exception to the traditional rules of standing and allows parties not yet affected by a statute to bring actions under the First Amendment based on a belief that a certain statute is so broad as to 'chill' the exercise of free speech and expression." *Id.* at 1182 (citations omitted). Thus, "[a] statute is unconstitutional on its face on overbreadth grounds if there is 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court....' " *Id.* (*quoting Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)).

 While a plaintiff such as MAWAD may have standing to challenge an overbroad statute or rule, despite the absence of a concrete and particularized injury, when such statute or rule serves to chill the plaintiff's speech, the circuit court erred in finding that standing exists in this case. Put simply, nothing in the Board's legislative rules "chills" protected speech by MAWAD or anyone else. *See Martin v. U.S. Envtl. Prot. Agency,* 271 F.Supp.2d 38, 47 (D.D.C.2002) (explaining that speech is chilled "when an otherwise willing speaker is prevented from speaking, or cajoled into no longer speaking, by government conduct."). MAWAD may publically espouse any view it desires without facing any repercussion from the Board.[6] That MAWAD believes its views are less credible in the eyes of the public because it is not a licensed domestic violence program, and its members are not certified domestic violence advocates, is not an issue of free speech.[7] Nothing in the First Amendment

6. Despite framing the issue as a challenge to an overly broad statute, thereby negating the need to show injury-in-fact, the circuit court additionally found that MAWAD was engaged in "self-imposed chilling" of speech and, thus, had established an injury-in-fact. The circuit court relied on several federal cases permitting plaintiffs to bring pre-enforcement challenges to statutes that impose criminal or other penalties, thereby allowing a plaintiff to challenge the constitutionality of a statute or rule before engaging in conduct which would otherwise subject the plaintiff to prosecution or other penalties. *See, e.g., Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. But '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.' ") (*quoting Penns. v. W. Va.,* 262 U.S. 553, 593, 43 S.Ct. 658, 67 L.Ed. 1117 (1923)). The circuit court likened MAWAD's "self-imposed chilling" of its own speech to that of a plaintiff who refrains from speech while bringing a pre-enforcement challenge.

Contrary to the circuit court's reasoning, however, nothing in the Board's legislative rules threaten MAWAD with any type of repercussion for engaging in speech. To the extent that MAWAD is, in fact, engaged in "self-imposed chilling" of its own speech, it does so for no discernable reason. MAWAD is free to disseminate its opinions as to the nature of domestic violence and it faces no sanction from the Board for so doing.

7. To the extent that MAWAD contends that its right to free speech is encumbered because it is unable to become a licensed domestic violence shelter, domestic violence program or PIP, the Court finds MAWAD's arguments unavailing. The requirements set forth by the Board's legislative rules for licensure apply equally to MAWAD as they do to any other individual or organization seeking to provide services to victims and/or perpetrators of domestic violence. MAWAD has not presented any evidence that it would be denied a license by the Board if it met the applicable requirements for licensure. The Board does not infringe upon MAWAD's freedoms by requiring it to meet the same criteria it requires of all service providers.

MAWAD's members are equally free to seek certification as domestic violence advocates. Like all others seeking certification, however, MAWAD's members must meet the criteria set forth by the Coalition to become certified. Once

gives any person a right to *more credible* speech; rather, the First Amendment merely prohibits the government from infringing upon a person's freedom to engage in protected speech. Consequently, the circuit court erred in ruling that MAWAD has standing to bring its claims in this case, and its October 2, 2009, order is reversed on that ground.

■ Although we reverse the circuit court's entry of summary judgment on the basis of standing, we further conclude that its decision to render three of the Board's legislative rules "null and void" lacked any legal basis. In its final order, the circuit court invalidated C.S.R. §§ 191–2–1, 191–2–4.11, and 191–3–3, finding that each conflicted with the express intention of the Legislature and chilled MAWAD's speech.[8] As previously explained, none of these sections serve to "chill" MAWAD's speech, as nothing in the Board's legislative rules impose any restrictions whatsoever on MAWAD's ability to engage in constitutionally protected speech. We take this opportunity, however, to further clarify that none of the invalidated provisions conflict with the clear legislative intent found in the WVDVA prohibiting discrimination based on sex. *See* W. Va.Code § 48–26–601(c) ("A family protection shelter or program may not be funded initially if it is shown that it discriminates in its services on the basis of race, religion, age, sex, marital status, national origin or ancestry. If such discrimination occurs after initial funding, the shelter or program may not be refunded until the discrimination ceases.").

Of the three sections of the Board's legislative rules invalidated by the circuit court, only one permits licensed facilities to differentiate between victims of domestic violence on the basis of sex. Specifically, C.S.R. § 191–2–4.11, which requires shelters to have a written process for obtaining alternative housing for special needs populations, addresses the fact that adult and adolescent males may require special accommodation when seeking shelter from domestic violence. Nothing in that section requires that adult and adolescent males be housed in separate facilities; rather, in promulgating the rule, the Board recognized that not all shelters will be equipped to provide facilities that can accommodate both male and female victims while meeting the privacy and safety concerns of both groups. The record in this case indicates that the majority of victims of domestic violence who seek shelter at licensed facilities in West Virginia are women.[9] Thus, from a practical standpoint, it is not

---

again, MAWAD's freedom of speech is not infringed upon because its members are required to meet the same criteria as all others who seek certification as domestic violence advocates.

**8.** Inexplicably, the circuit court invalidated C.S.R. § 191–2–1, entitled "General," which states in its entirety:

> 1.1. Scope—This rule establishes general standards and procedures for the licensure of family protection programs as specified in W. Va.Code § 48–26–401. The West Virginia Code is available in public libraries and on the Legislature's web page at http://www.legis.state.wv.us/.
> 1.2. Authority—W. Va.Code §§ 48–26–401(4) and 48–26–402.
> 1.3. Filing Date—June 23, 2003.
> 1.4. Effective Date—August 11, 2003.

W.Va.C.S.R. § 191–2–1. Nothing in this section of the legislative rule addresses, directly or indirectly, the gender of a domestic violence victim or perpetrator. Rather, section 191–2–1 merely sets forth the purpose of the rule, the statute granting authority for the rule's promulgation, and the date on which the rule was filed and the date on which it became effective.

Although its order repeatedly references this section, the circuit court never explains any basis for rendering it null and void. Accordingly, because nothing in C.S.R. § 191–2–1 violates the legislative intent set forth in the WVDVA to prohibit discrimination based on sex, the circuit court's invalidation of this section was clearly in error.

**9.** Appellant Judy King Smith, the executive director of the Rape and Domestic Violence Information Center ("RDVIC") in Morgantown, West Virginia, testified that RDVIC's records from 1978 until present indicate that the number of women requesting shelter is "overwhelming" when compared with the number of men. Similarly, Appellant Judith Ball, the Administrative Director of the Family Crisis Intervention Center ("FCIC") in Wood County, West Virginia, testified that, throughout the history of FCIC, "most people who access our program are women." She noted that men have stayed at the FCIC shelter, but that no men have requested overnight housing in the last six years. MAWAD did not introduce any evidence to show that any shelter in West Virginia receives equal or greater requests for assistance from male victims of domestic violence than from female victims.

unreasonable for shelters to use their limited resources to accommodate the group that makes up the vast majority of their clientele, while providing alternate lodging when necessary for "special needs" populations.

Indeed, contrary to MAWAD's assertions, C.S.R. § 191–2–4.11 actually mandates that all victims of domestic violence receive appropriate accommodation when seeking shelter by forbidding licensed providers from turning away adult and adolescent males merely because the shelter lacks adequate facilities to house them.[10] Consequently, nothing in C.S.R. § 191–2–4.11 conflicts with the clear legislative intent set forth in the WVDVA to provide shelter services to all victims of domestic violence, regardless of sex.[11]

The circuit court similarly lacked any basis for invalidating C.S.R. § 191–3–3, which requires that service providers in PIPs receive instruction on, among other things, "the understanding that domestic violence is deeply rooted in historical attitudes toward women and is intergenerational." *Id.* at § 191–3–3.3.a.3.[12] Nothing in this rule conflicts with the legislative intent expressed in the WVDVA because the rule does not mandate discrimination in the service provider training process. The rule simply requires instruction on the history of domestic violence; it does not imply that all perpetrators of domestic violence are men, nor that women cannot be perpetrators. Indeed, the legislative rule as a whole uses gender neutral terms such as "perpetrator" and "victim," and no where within the rule is there any indication that those terms are sex-specific. *See* C.S.R. § 191–3–1 to –3.

Moreover, in promulgating C.S.R. § 191–3–3, the Board is exercising its own ability to express a message it considers important; because it is a legislative rule, the Legislature has sanctioned this message as well. *See Smith*, 216 W.Va. 2, 602 S.E.2d 445, Syl. Pt. 5. Governments routinely take positions on issues with which some members of the public disagree and doing so does not discriminate against the dissenter or otherwise violate his rights. *See, e.g., Rust v. Sullivan*, 500 U.S. 173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other."). While MAWAD may disagree with the Board's decision to require instruction on the historical nature of domestic violence, such disagreement does not annul the Board's validly promulgated legislative rule requiring such instruction. Consequently, the circuit court erred by invalidating C.S.R. § 191–3–3 as conflicting with the expressed intent of the legislature.

## IV. CONCLUSION

For the reasons set forth herein, the final order of the Circuit Court of Kanawha County, West Virginia, entered on October 2, 2009, is reversed and the case is remanded with directions to the circuit court to enter

---

**10.** Deposition testimony from Appellants Smith and Ball indicated that some shelters are able to house male victims of domestic violence within their facilities, while other shelters provide alternative lodging in local motels or homeless shelters.

**11.** An appellate court in California similarly recognized that providing separate accommodations for male victims of domestic violence may be appropriate, even when programs are required to be "gender-neutral":

In reforming the statutes that provide funding for domestic violence programs to be gender-neutral, we do not require that such programs offer identical services to men and women.

Given the noted disparity in the number of women needing services and the greater severity of their injuries, it may be appropriate to provide more and different services to battered women and their children. *For example, a program might offer shelter for women, but only hotel vouchers for a smaller number of men.* Woods v. Horton, 167 Cal.App.4th 658, 679, 84 Cal.Rptr.3d 332 (2008) (emphasis added).

**12.** While the circuit court invalidated the entirety of C.S.R. § 191–3–3, which covers a variety of licensing standards for PIPs, it focused its analysis exclusively on subsection 3.3.a.3, which mandates instruction on the historical roots of domestic violence.

an order dismissing the action for lack of standing.

Reversed and remanded with directions.