IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Spring 2025 Term

FILED

June 12, 2025

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

_____

Nos. 24-ICA-97, 24-ICA-98, 24-ICA-99, 24-ICA-100,
24-ICA-122, and 24-ICA-123

_____

PUTNAM COUNTY AGING PROGRAM, INC., FAYETTE COUNTY
SENIOR PROGRAMS and SUMMERS COUNTY COUNCIL ON AGING,

Affected Parties Below, Petitioners,

v.

PANHANDLE SUPPORT SERVICES, INC; A SPECIAL TOUCH IN HOME CARE,
LLC; VILLAGE CAREGIVING, LLC; ELDER AIDE SERVICES, LLC, D/B/A RIGHT
AT HOME; and SOUTHERN HOME CARE SERVICES, INC., D/B/A ALL WAYS
CARING HOMECARE,

Applicants Below, Respondents,

AND

WEST VIRGINIA HEALTH CARE AUTHORITY,

Respondent.
_____

Appeal from the West Virginia Health Care Authority

AFFIRMED, in part, REVERSED, in part, and REMANDED with instructions
_____

Submitted:  February 5, 2025
Filed:  June 12, 2025

Richard W. Walters, Esq.
Ryan W. Walters, Esq.
Shaffer & Shaffer, PLLC
Charleston, West Virginia
Counsel for Petitioners

Brock M. Malcolm, Esq.
Michael C. Cardi, Esq.
Bowles Rice, LLP
Morgantown, West Virginia
Counsel for Respondent Panhandle Support Services, Inc.

John B. McCuskey, Esq.
Michael R. Williams, Esq.
Caleb A. Seckman, Esq.
Frankie Dame, Esq.
Spencer J. Davenport, Esq.
Office of the WV Attorney General
Charleston, West Virginia
Counsel for Respondent WV Health Care Authority

Robert L. Coffield, Esq.
Shaina D. Massie, Esq.
Nelson Mullins Riley & Scarborough LLP
Huntington, West Virginia
Counsel for Respondents Elder Aide Services, LLC, d/b/a Right at Home; Village Caregiving, LLC; and A Special Touch In Home Care, LLC

Nathaniel J. Pencook, Esq.
(admitted *pro hac vice*)
Nelson Mullins Riley & Scarborough LLP
Raleigh, North Carolina
Counsel for Respondents Elder Aide Services, LLC, d/b/a Right at Home; Village Caregiving, LLC; and A Special Touch In Home Care, LLC

Alaina N. Crislip, Esq.
Colton Koontz, Esq.
Jackson Kelly PLLC
Charleston, West Virginia
Counsel for Southern Home Care Services, Inc.

JUDGE GREEAR delivered the Opinion of the Court.

GREEAR, Judge:

In these consolidated appeals,[1] Petitioners Putnam County Aging Program, Inc. ("PCAP"),[2] Fayette County Senior Programs ("FCSP"),[3] and Summers County Council on Aging ("SCCOA")[4] (collectively "Petitioners")[5] appeal the February 7, 2024, and February 21, 2024, orders of the West Virginia Health Care Authority ("Authority") granting A Special Touch In Home Care, LLC ("STHC"); Southern Home Care Services, Inc. ("Southern"); Elder Aide Services, LLC, d/b/a Right at Home ("Elder"); and Village Caregiving, LLC's (collectively "Respondent Providers") certificate of need ("CON") applications to provide in-home personal care services ("PC Services"), through the

---

[1] 24-ICA-97, 24-ICA-100, 24-ICA-122, and 24-ICA-123 were consolidated by this Court's December 13, 2024, order for purposes of oral argument, consideration, and decision. 24-ICA-98 and 24-ICA-99 were consolidated by this Court's December 17, 2024, order for purposes of oral argument, consideration, and decision. Because issues in each set of the consolidated cases are similar and involve some of the same parties, for judicial economy and efficiency, we will decide both sets of consolidated cases together in this opinion.

[2] PCAP is a 501(c)(3) non-profit organization providing meals, transportation, and in-home care services to qualified seniors in a number of West Virginia counties. 501(c)(3) refers to PCAP's tax-exempt status under section 501(c)(3) of the Internal Revenue Code. *See generally* 26 U.S.C. § 501(c)(3) (eff. 2019).

[3] FCSP is an organization providing meals, transportation, and in-home services to qualified seniors. As noted in the record, FCSP and PCAP are "one entity" as FCSP is owned and operated by PCAP and "is a term used to refer to the collective group of aging program services offered by [PCAP] in Fayette County."

[4] SCCOA is a 501(c)(3) non-profit organization providing meals, transportation, and in-home services to qualified seniors in Summers County, West Virginia. 501(c)(3) refers to SCCOA's tax-exempt status under section 501(c)(3) of the Internal Revenue Code. *See generally* 26 U.S.C. § 501(c)(3) (eff. 2019).

[5] For purposes of clarification, in 24-ICA-123, "Petitioners" refers only to PCAP. SCCOA appears as a Petitioner only in case 24-ICA-99.

Medicaid program,[6] in specific counties in West Virginia.[7] On appeal, Petitioners argue that the Authority erred in granting Respondent Providers' underlying CON applications, as there was no unmet need in the proposed service areas; the in-home Personal Care Services Standards ("PC Standards") used by the Authority were arbitrary and capricious; granting Respondent Providers' CONs would have a negative effect on the community; and that the Authority was clearly biased against Petitioners. Based upon our review of the

---

[6] In *Burgess v. W. Va. Dep't of Hum. Servs.*, 250 W. Va. 428, 430-31, 903 S.E.2d 609, 611-12 (Ct. App. 2024), this Court recognized that:

> Authorized under Title XIX of the Social Security Act, Medicaid is an entitlement program financed by the state and federal governments and administered individually by each state. *See* 42 U.S.C. § 1396-1. In *Forloine v. Persily*, No. CV 3:23-0450, 2024 WL 1316237, at *1 (S.D.W. Va. Mar. 27, 2024), the United States District Court for the Southern District of West Virginia described Medicaid as a "cooperative federal-state program." *See Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, [565 U.S. 606, 610] (2012). Thus, in exchange for federal funds, states agree to follow "congressionally imposed conditions" in the Medicaid program. *See Armstrong v. Exceptional Child Ctr., Inc.*, [575 U.S. 320, 323] (2015).

The West Virginia entity which administers the federal funds received by West Virginia under title XIX of the Social Security Act is the Bureau for Medical Services ("BMS").

[7] In its February 7, 2024, decision, the Authority approved Village's CON application to provide PC Services in Berkeley, Boone, Braxton, Brooke, Cabell, Calhoun, Clay, Doddridge, Fayette, Gilmer, Grant, Greenbrier, Hampshire, Hancock, Hardy, Harrison, Jackson, Jefferson, Kanawha, Lewis, Lincoln, Logan, Marion, Marshall, Mason, McDowell, Mercer, Mineral, Monongalia, Monroe, Morgan, Nicholas, Ohio, Pleasants, Pocahontas, Preston, Putnam, Raleigh, Randolph, Ritchie, Roane, Summers, Taylor, Tyler, Upshur, Wayne, Webster, Wetzel, Wirt, Wood, and Wyoming Counties.

In three separate February 21, 2024, decisions, the Authority approved Southern's application to provide PC Services in Boone, Clay, Logan, Nicholas, Putnam, and Roane Counties; Elder's application to provide PC Services in Cabell, Fayette, Putnam, and Wayne Counties; and STHC's application to provide PC Services in Kanawha, Cabell, Fayette, Putnam, and Wayne Counties.

record, including the oral and written arguments of counsel, and applicable law, we disagree and find no error in the Authority's approval of Respondent Providers' CON applications.

Petitioners also appeal the Authority's February 8, 2024, Dismissal Orders granting Panhandle Support Services, Inc.'s ("Panhandle") motions for summary judgment and canceling previously scheduled public hearings on Panhandle's CON applications to provide PC Services in select counties in West Virginia.[8] On appeal, Petitioners argue that the Authority erred in granting Panhandle's motions for summary judgment, as the Authority's hearing examiner lacked the power to award summary judgment. Further, FCSP contends that the Authority erred in revoking its "affected person" status. After our review of the record and consideration of the oral and written arguments of counsel, we agree, in part, with Petitioners and find that the Authority erred in awarding summary judgment to Panhandle and in canceling the public hearings on Panhandle's CON applications. However, we find no error with the Authority's determination that FCSP lacked "affected person" status to challenge Panhandle's CON application. Accordingly, we affirm, in part, and reverse, in part, the Authority's February 8, 2024, Dismissal Orders.

---

[8] 24-ICA-98 addresses Panhandle's CON application to provide PC Services in Mason, Putnam, Cabell, Wayne, and Lincoln Counties. 24-ICA-99 addresses Panhandle's CON application to provide PC Services in Fayette, Raleigh, Summers, Monroe, Mercer, and Greenbrier Counties.

We begin our review of the issues on appeal by generally examining CON law in West Virginia. CONs are governed by West Virginia Code §§ 16-2D-1 to -20, which includes a number of provisions outlining CON definitions, powers and responsibility of the Authority related to CONs, the CON application process, standards by which CONs are to be reviewed, and how CON review standards are amended. In West Virginia Code § 16-2D-1 (2016), the West Virginia Legislature ("Legislature") declared that it is the public policy of this state:

> (1) That the offering or development of all health services shall be accomplished in a manner which is orderly, economical[,] and consistent with the effective development of necessary and adequate means of providing for the health services of the people of this state and to avoid unnecessary duplication of health services, and to contain or reduce increases in the cost of delivering health services.
>
> (2) That the general welfare and protection of the lives, health[,] and property of the people of this state require that the type, level[,] and quality of care, the feasibility of providing such care and other criteria . . . including [CON] standards and criteria developed by the [A]uthority pursuant to provisions of this article, pertaining to health services within this state, be subject to review and evaluation before any health services are offered or developed in order that appropriate and needed health services are made available for persons in the area to be served.

To effectuate the State's public policy in this regard, West Virginia Code § 16-2D-3(a) (2017) requires that the Authority[9] shall (among other duties):

> (1) Administer the [CON] program; (2) Review the state health plan, the [CON] standards, and the cost effectiveness of the [CON] program and make any amendments and modifications to each that it may deem necessary . . . (4) Create a standing advisory committee to advise and assist in amending the state health plan, the [CON] standards, and performing the state agencies' responsibilities.

Additionally, the Legislature, in West Virginia Code § 16-2D-6(a), promulgated procedures for the Authority to follow in making changes to CON standards, including filing with the Secretary of State, for publication in the State Register, "a notice of proposed action, including the text of all proposed changes, and a date, time[,] and place for receipt of general public comment." This code section further requires the Authority to form task forces (comprised of representatives of consumers, business, providers, payers, and state agencies) to assist in satisfying its review and reporting requirements.

Moreover, West Virginia Code § 16-2D-6(f) (2016) mandates that all proposed changes to CON standards (with records of the public hearing or written

---

[9] "Authority" is defined in West Virginia Code § 16-2D-2(5) (2017) as the West Virginia Health Care Authority. We note that West Virginia Code § 16-2D-2 was amended in 2023 and 2024, but those amendments did not address or affect § 16-2D-2(5).

statements and documents received during the public comment period) be presented to the Governor. Within thirty days of receipt of said materials, the Governor "shall either approve or disapprove all or part of the amendments and modifications." Lastly, West Virginia Code § 16-2D-12(a)(1)-(2) (2016) provides that a CON may only be issued if the proposed health service is found to be needed and is consistent with the state health plan, unless there are emergency circumstances that pose a threat to public health.

The legislative rules for the Authority related to CONs are set forth in W. Va. Code R. § 65-32-1 to -21 (2022).[10] These rules implement the provisions of the CON program found in West Virginia Code §§ 16-2D-1 to -20, and include rules regarding CON requirements and standards, CON applications, the CON application review process, the requirements of the Authority's decision in CON cases, and appeals of the Authority's CON decisions. Critical to the underlying cases, W. Va. Code R. § 65-32-8.11 requires the "Authority [to] hold a public hearing on [a CON] application if it is requested within the time period[11] . . . by any affected person." The rules further require that the "Authority shall conduct the public hearing in accordance with the requirements for administrative

---

[10] W. Va. Code R. § 65-32-1-21 was filed on April 1, 2022, and became effective that same date. These rules were amended by the Legislature on May 1, 2024 (effective May 1, 2024); however, the provisions cited herein were unchanged by the 2024 amendments.

[11] W. Va. Code R. § 65-32-8.14 requires that such hearings shall "be conducted no later than three (3) months from the date the hearing order is entered by the Authority and in accordance with the administrative hearing requirements in [West Virginia Code §§ 29A-5-1-20]."

hearings found in West Virginia Code [§§ 29A-5-1-20]." W. Va. Code R. § 65-32-8.25 provides that "[t]he affected parties may engage in discovery as provided by the West Virginia Rules of Civil Procedure."

As noted in W. Va. Code R. § 65-32-8.11, the Authority is required to conduct public hearings (if timely requested by an affected person) pursuant to West Virginia Code §§ 29A-5-1 to -5, known generally as the Administrative Procedures Act ("APA"). West Virginia Code § 29A-5-1(a) provides that "[i]n any contested case all parties shall be afforded an opportunity for hearing after at least ten days' written notice." This statutory section further provides, at subsection (d), that

> the hearing examiner . . . shall have the power to: (1) Administer oaths and affirmations, (2) rule upon offers of proof and receive relevant evidence, (3) regulate the course of the hearing, (4) hold conferences for the settlement or simplification of the issues by consent of the parties, (5) dispose of procedural requests or similar matters, and (6) take any other action authorized by a rule adopted by the agency . . . .

Each of the underlying cases involves the Authority's consideration of Respondent Providers' CON applications to provide PC Services in certain West Virginia counties. In addition to meeting statutory requirements and abiding by the associated legislative rules related to their CON applications, said providers must also meet the PC Standards for each county in which they applied to provide services. The PC Standards used by the Authority in consideration of Respondent Providers' underlying CON

7

applications were revised by the Authority in 2022-2023, via the processes outlined in West Virginia Code §§ 16-2D-6, and were approved by the Governor on April 27, 2023.[12]

On their face, these amended PC Standards denote that they "address the necessary criteria which must be met to obtain a [CON] to provide" PC Services. PC Services are therein denoted as "services available to assist an eligible [patient] to perform activities of daily living and instrumental activities of daily living in the [patient's] home, place of employment[,] or community." The PC Standards further require, under "need methodology" that all CON applicants for such service "must demonstrate[,] with specificity[,] that:

1.  There is an unmet need for the proposed service;

2.  The proposed service will not have a negative effect on the community by significantly limiting the availability and viability of other services or providers; and

3.  The proposed services are the most cost effective alternative.

The process used within the 2023 PC Standards to quantify unmet need, on a county by county basis, is as follows:

1.  Total [n]umber of [r]esidents receiving Medicaid per county;

---

[12] We acknowledge that, in their appeals herein, Petitioners argue that the PC Standards were not properly amended by the Authority in 2023 and that said amendments were arbitrary and capricious, which we will discuss in this opinion.

8

2. Total [n]umber of [r]esidents receiving Medicaid per county multiplied by 3% (this will give the total number of residents who may be receiving [PC Services] or who may benefit from receiving services).

3. The total [n]umber of [r]esidents, as reported by BMS, who are receiving [PC Services] is subtracted from the [t]otal [n]umber of residents in step two.

4. If there is an unmet need of 25 or more then the [c]ounty is considered open to additional providers.

5. If a new provider has been approved within the previous 12 months, the Authority will subtract 25 from each applicable county proposed.

Prior to the 2023 amendment, the PC Standards were last amended in 2016. The 2023 PC Standards are similar to the 2016 PC Standards, with the exception of the multiplier used in the unmet need formula. In 2016, the multiplier was 1.25%, compared to its present 3%.

*Standard of Review for all cases on appeal*

This Court has jurisdiction over the appeals herein pursuant to West Virginia Code § 16-2D-16a(a) (2021). Pursuant to West Virginia Code §§ 16-2D-16a(a)(2) (2021) and 29A-5-4(g) (2021), our standard of review for certificate of need decisions issued by the Authority is set forth as follows:

> The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the Petitioner or Petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are:

9

(1)     In violation of constitutional or statutory provisions;

(2)     In excess of the statutory authority or jurisdiction of the agency;

(3)     Made upon unlawful procedures;

(4)     Affected by other error of law;

(5)     Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or

(6)     Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

West Virginia Code § 29A-5-4(g) (2021). Further, "'[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review.'" Syl. Pt. 4, *Amedisys W. Va., LLC v. Pers. Touch Home Care of W. Va., Inc.*, 245 W. Va. 398, 859 S.E.2d 341 (2021) (quoting Syl. Pt. 2, *Steager v. Consol. Energy, Inc.*, 242 W. Va. 209, 832 S.E.2d 135 (2019)). With these standards in mind, we now address the underlying cases.

### Cases 24-ICA-98 and 24-ICA-99

*Facts and Procedural Background*

We first turn to the two matters involving Respondent Panhandle. On June 1, 2023, the Authority received two separate "letters of intent" from Panhandle, in which Panhandle advised of its intent to file CON applications to provide PC Services in certain

10

West Virginia counties.[13] Panhandle timely followed its letters of intent by filing the underlying CON applications with the Authority. In its CON applications, Panhandle advised that it already "provid[ed] these [PC Services in the areas at issue] through a contractual agreement with a partner that holds a [CON]."[14] Thus, Panhandle noted "[t]here would be no change in the continuity of services and accessibility with the approval of the CON[s]." Moreover, when asked to identify alternatives to the CON proposal (in its CON applications, Panhandle stated:

> The alternative to this proposal is [Panhandle] not providing care to the [patients] it already provides care to. The personal care program of WVDHHR is going to eliminate the capability of subcontracting CON[s]. This will lead to a loss of care to [patients] already enrolled in the [PC Services] program and are serviced by direct care workers employed by [Panhandle]. Additionally, this would mean a loss of employment for direct care workers providing this service.

---

[13] In the first letter, Panhandle advised of its intent to file a CON application to provide PC Services in Mason, Putnam, Cabell, Wayne, and Lincoln Counties. In the second letter, Panhandle indicated its intent to file a CON application to provide PC Services in Fayette, Raleigh, Summers, Monroe, Mercer, and Greenbrier Counties.

[14] At the time of the filing of its underlying CON applications, Panhandle provided PC Services in the geographic areas at issue under a July 21, 2004, subcontractor agreement ("Services Agreement") with Prestera Center for Mental Health Services, Inc. ("Prestera"), who then held a CON permitting it to provide PC Services in these areas. In the Services Agreement, a "Catchment Area" (to which the subcontractor agreement allegedly applied) was defined as Cabell, Wayne, Lincoln, Mason, Putnam, Kanawha, Boone, and Clay Counties. An addendum was added to the Services Agreement on October 5, 2023, which clarified the definition of the "Catchment Area" to include counties in which Prestera holds a CON for PC Services, including Summers County.

11

Panhandle's CON applications were "deemed completed" by the Authority on June 15, 2023.[15] By letter dated June 5, 2023, PCAP wrote to the Authority to protest Panhandle's letter of intent for the Mason, Cabell, Putnam, Lincoln, and Wayne County service area.[16] On June 6, 2023, SCCOA wrote to the Authority to protest Panhandle's letter of intent for Fayette, Raleigh, Summers, Monroe, Mercer, and Greenbrier Counties. By letter dated June 13, 2023, FCSP wrote to the Authority to protest Panhandle's letter of intent for the Fayette, Raleigh, Summers, Monroe, Mercer, and Greenbrier Counties.[17]

---

[15] There is no argument raised, by any party, that Panhandle's CON applications were not "complete" or that the Authority did not properly provide legal notice of the CON applications to potentially affected persons.

[16] In its June 5, 2023, letter, PCAP advised that it currently provided PC services throughout Putnam County and had the capacity to serve any additional individuals identified in need of its services. Further, PCAP noted that there were currently ten approved PC service providers in Putnam County, "which ensures program members already have adequate choice." PCAP additionally stated that the demand for its services "greatly outweighs the state and federal funding" it receives to provide care, in that "[o]nly 50% of [its] current meal participants are covered by [its] state and federal awards." Because of this shortage in funding, PCAP claimed that it "reinvest[ed] [its] revenues generated by providing Medicaid Personal Care services into [its] nutrition and transportation programs, enabling [it] to serve additional participants." Thus, PCAP argued that granting Panhandle's CON applications would "have a negative effect on the community [of Putnam county] as a whole by limiting the availability and viability of [PCAP's] nutrition and transportation programs."

[17] Like PCAP, both FCSP and SCCOA indicated that they too reinvested revenues from providing PC Services into their nutrition and transportation programs, allowing them to serve additional persons. Accordingly, SCCOA and FCSP stated that the proposed CON application could be detrimental to their service programs and "have a negative effect on the community as a whole by limiting the availability and viability of [its] nutrition and transportation programs."

12

PCAP again wrote to the Authority, on July 11, 2023, and identified itself as an affected person as to Panhandle's CON application in 24-ICA-98, objected to said application, and requested that the Authority hold a public hearing. Like PCAP, both SCCOA (by letter dated July 11, 2023) and FCSP (by letter dated July 17, 2023), in 24-ICA-99, wrote to the Authority and identified themselves as affected persons to Panhandle's CON application, objected to the application, and requested the Authority hold a public hearing. The Authority, by letters dated July 17, 2023, acknowledged receipt of these letters requesting affected person status and requests for an administrative (public) hearing.[18] On August 1, 2023, the Authority issued Notices of Prehearing Conference and Administrative Hearing, noting that prehearing conferences would be held on Panhandle's CON applications on October 6, 2023, and administrative (public) hearings would be held on October 16, 2023, and October 13, 2023.

Panhandle filed motions for summary judgment in both of its underlying cases on October 2, 2023. In these motions, Panhandle argued that public hearings were not necessary, as Petitioners would simply argue that despite the establishment of an unmet need in the counties at issue (using the 2023 PC Standards and need methodology) that there was no actual need for PC Services in these counties. Panhandle alleged that there was no merit to Petitioners' arguments in this regard, as 1) Panhandle already provided PC

---

[18] There is no indication in the Authority's July 17, 2023, letter directed to FCSP, that FCSP did not qualify as an affected person.

Services within the areas at issue as a subcontractor for Prestera; and 2) the Authority had already approved some of Panhandle's other CON applications (using the same PC Standards and methodology), which Panhandle had filed contemporaneously with the two CON applications at issue herein.

In PCAP's response to Panhandle's motions, it argued that summary judgment was improper because the evidentiary record was incomplete, as PCAP had not yet had the opportunity, via public hearing, to question persons regarding the CON application at issue. PCAP argued that it anticipated that multiple witnesses would testify at the previously scheduled public hearings, under oath, to "matters not yet disclosed by either side." Further, PCAP was critical of Panhandle's "mischaracterization" of the arguments that PCAP would advance at the public hearing and noted that it had not yet provided any argument in this matter and that Panhandle's "misallocation" of PCAP's position "highlighted the significance of PCAP's argument that an incomplete evidentiary record" creates "a high risk of" the Authority "improperly reaching a conclusion." Additionally, PCAP renewed its arguments that the PC Services proposed in Panhandle's CON applications would have a negative effect on the community by limiting other services – namely the nutrition and transportation services provided by PCAP, which are funded, in part, by PCAP's provision of PC Services.

On October 4, 2023, Panhandle filed, in 24-ICA-99, an amended motion for dismissal of affected persons, seeking dismissal of FCSP. In its amended motion,

Panhandle alleged that FCSP "is a wholly fictional entity[,]" which does not qualify as an affected person under West Virginia Code § 16-2D-2.[19]

The pretrial conference hearing before the Authority's hearing examiner was completed, in 24-ICA-98, on October 6, 2023. At that hearing, Panhandle argued in support of its motion for summary judgment and stated

> [t]his is not a case of a new provider coming into a service area and stealing away clients or stealing away employees. This is a provider who has been in the area for a number of years. And the granting [of] the CON won't affect any other entity except the entity to which it has its subcontractor arrangement, and that entity is not objecting to this application.

In response, PCAP argued that a motion for summary judgment was itself improper as there is "no mechanism for a Rule 56" motion under the Authority's policies and procedures or the APA. Further, PCAP argued that summary judgment is not proper as discovery is ongoing and PCAP intended to obtain evidence in support of its position at the public hearing. Counsel for PCAP was directly questioned by the hearing examiner as to what "material facts" remain in dispute, to which PCAP again expressed the need for the public hearing to permit PCAP the opportunity to elicit such facts in support of its position. Specifically, PCAP argued that "[i]t's our intent through . . . the evidentiary

---

[19] Panhandle argued that during testimony in an unrelated CON matter, it discovered that FCSP is not a company, an affiliate of another company, or even a d/b/a of a company that is licensed to do business within the State of West Virginia. Instead, Panhandle argued that it is PCAP, not FCSP, that is the affected person, if any, in 24-ICA-99.

15

hearings to elicit facts that [Panhandle] cannot meet with specificity, cannot demonstrate the elements necessary to meet number one and number two of the need methodology." PCAP identified that it would establish such facts through evidentiary testimony of PCAP's director and through the testimony of Panhandle's representatives.

Despite the protestations of PCAP's counsel, the hearing examiner granted Respondent Panhandle's motion for summary judgment. First, the hearing examiner ruled that the Authority under the "authority of the APA" had the "ability to entertain dispositive motions." Second, the hearing examiner concluded that summary judgment was appropriate, as there was no genuine issue of material fact that would be produced by PCAP "that would entitle [it] to judgment as a matter of law because need methodology has been established and there are no facts that could be shown that the provision of personal care services under an individual CON would affect the affected parties negatively." A Dismissal Order was entered by the Authority, in 24-ICA-98, on February 8, 2024.

In 24-ICA-99, a pretrial hearing was also held on October 6, 2023. During that hearing, Panhandle argued in support of its motion for summary judgment and its amended motion seeking dismissal of FCSP as an affected person.[20] FCSP argued that

---

[20] Panhandle argued that dismissal of FCSP as an "affected [person]" was necessary, as FCSP did not meet the definition of affected person in West Virginia Code § 16-2D-2(1)(A)-(H). However, Panhandle noted that dismissal of FCSP as an affected person would not prevent FCSP's representatives from attending any public hearing in 24-ICA-99, as a member of the public. Panhandle noted that at the public hearing, FCSP would be

16

Panhandle's amended motion was untimely filed, as it was not filed within the time frame contemplated within the scheduling order. Instead, it was filed a day late, on October 4, 2023. As such, FCSP argued that the amended motion should not be considered. Panhandle acknowledged its late filing of the amended motion but advised it was completed in the immediate days following a public hearing in another matter where PCAP's executive director testified as to the relationship between FCSP and PCAP and disclosed that FCSP was not a legal entity.

As to the amended motion, FCSP argued that it was an affected person under West Virginia Code § 16-2D-2(1) and, accordingly, dismissal was improper. FCSP advised that FCSP "is a term used to refer to the collective group of aging program services offered by [PCAP] in Fayette County. [PCAP] and [FCSP] are one in the same and can be used synonymously." Accordingly, FCSP stated that it qualified as an affected person under the applicable statue.

SCCOA also filed a formal response to Panhandle's amended motion and motion for summary judgment in 24-ICA-99, advancing arguments similar to those advanced by PCAP in the underlying companion case. Namely, SCCOA argued that there was no unmet need for in-home personal care services in Summers County, but that even

able to offer comments on Panhandle's CON application in 24-ICA-99, but acknowledged that without affected person status, FCSP would "not be permitted to offer any evidence, present any exhibits, or make any legal arguments whatsoever[.]"

17

if an unmet need existed in Summers County, the 2023 PC Standards and need methodology identified only 59 recipients with an unmet need. However, SCCOA noted that there were two other pending CON applications for providers seeking to provide PC Services in Summers County, and that if those applications are granted, the number of persons with an unmet need would drop below 25, which would establish that there is no unmet need for PC Services in Summers County. SCCOA also argued that the record in the underlying case was not complete, as it was not permitted to take testimony from witnesses at the public hearing on the issue of unmet need and revised need methodology.[21]

Again, despite the protestations of SCCOA and FCSP, the hearing examiner awarded summary judgment to Respondent Panhandle at the pretrial hearing and dismissed FCSP as an affected person. Following the hearing, on February 8, 2024, the Authority entered its Dismissal Order, in which it concluded that FCSP is not a legal entity meeting any of the definitions that would afford it affected person status under West Virginia Code § 16-2D-2. The Authority acknowledged that Panhandle failed to follow the Authority's administrative rules by not timely filing its amended motion, but found the delay inconsequential, as it was the duty of the Authority to determine a person's eligibility for affected person status.

---

[21] Additionally, SCCOA argued that if the CON application was granted (in 24-ICA-99) that it would have a "direct negative effect on its citizens in jeopardizing its ability to offer other services to seniors, including but not limited to nutrition and transportation, that are significantly funded with profits from in-home personal care and waiver services."

As to SCCOA, the Authority determined that SCCOA failed to assert the existence of any material issues of fact that needed to be addressed at a public hearing. The Authority contends that it "allowed" both PCAP and SCCOA, during the pretrial conferences,

> a separate opportunity to develop its record with regard to the Authority's procedures in developing and submitting the 2023 PC Standards to the Governor for his approval. As such, it [was] unnecessary for the public hearing to be held in order to develop that issue. Similarly, it [was] unnecessary to hold a public hearing to allow an affected party to attack the [CON] Application's purported potential impact on 'other services,' such as food delivery services, which are wholly unrelated to the PC Services at issue here.

The Authority ruled that it had previously, and consistently, found that "other services" must be related to the service at issue in the CON application to be considered. The Authority gave great weight to the fact that Panhandle had been providing PC Services in the target service area for years (through its sub-contract agreement), such that the granting of Panhandle's CON application in 24-ICA-99 would "not create any new negative impact on any services offered by the affected person." It is from the February 8, 2024, Dismissal Orders that Petitioners now appeal.

*Discussion*

On appeal, Petitioners advance five assignments of error. As their first three assignments of error address the propriety of the hearing examiner's award of summary judgment to Panhandle, we will address those assignments together. *See generally Tudor's*

19

*Biscuit World of Am. v. Critchley*, 229 W. Va. 396, 402, 729 S.E.2d 231, 237 (2012) (per curiam) (consolidating assignments of error). Petitioner FCSP also argues, in 24-ICA-99, that the Authority erred when it found that FCSP was wrongfully provided "affected person" status. Additionally, Petitioners contend that the Authority "improperly promulgated" its 2023 PC Standards need methodology, rendering such standards arbitrary and capricious.

First, we address FCSP's argument that the Authority erred when it found FCSP was wrongfully provided "affected person" status. "Affected person" is defined in West Virginia Code § 16-2D-2(1)(A)-(H) (2017)[22] as:

> (A) The applicant; (B) An agency or organization representing consumers; (C) An individual residing within the geographic area but within this state served or to be served by the applicant; (D) An individual who regularly uses the health care facilities within that geographic area; (E) A health care facility located within this state which provide[s] services similar to the services of the facility under review and which will be significantly affected by the proposed project; (F) A health care facility located within this state which, before receipt by the authority of the proposal being reviewed, has formally indicated an intention to provide similar services within this state in the future; (G) Third-party payors who reimburse health care facilities within this state; or (H) An organization representing health care providers[.]

---

[22] We note that West Virginia Code § 16-2D-2 (2017) was amended by the West Virginia Legislature in 2023 and 2024, but those amendments did not address or affect § 16-2D-2(1)(A)-(H).

20

As the Supreme Court of Appeals of West Virginia ("SCAWV") held in syllabus point 4 of *Clark v. West Virginia Consolidated Public Retirement Board*, No. 24-208, 2025 WL 1261082 (W. Va. 2025), "'[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.' Syl. Pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951)." Below, the Authority's hearing examiner found that FCSP "failed to meet the definition of an affected party[.]" Based upon our review of the record, and applicable law, including the clear and unambiguous definitions set forth in West Virginia Code § 16-2D-2(1)(A)-(H) (2017), we agree with the Authority.

Here, the record established that FCSP was not the CON applicant, an "agency or organization representing consumers[,]" an individual residing in the geographic area, an individual who regularly uses the health care facilities within the geographic area, a health care facility, a third-party payor, or an organization representing health care providers. Moreover, the record further established that FCSP was not, itself, a 501(c)(3) non-profit organization; was not a corporation, LLC, or other company registered with the West Virginia Secretary of State's Office; and was not a d/b/a or a registered affiliate of PCAP.

Instead, FCSP acknowledged that it was legally operating as PCAP, and suggested that there "should have been no confusion as to the fact that [PCAP and FCSP] are one in the same entity[,] as it was clearly set forth in the document requesting affected

21

party status." [23] FCSP described that PCAP and FCSP are "one in the same[;]" that their company names "can be used synonymously[;]" and that "everything [FCSP does] goes through [PCAP.]" In essence, FCSP argued that acknowledging FCSP as an affected party was the same as acknowledging PCAP as an affected party, as FCSP was PCAP. We are not persuaded by this circular argument, as it is contrary to the express representations contained within FCSP's letters to the Authority in 24-ICA-99. [24]

Further, important to this issue, is the Authority's recognition below that, in the underlying and other CON cases, PCAP and FCSP "have acted as though they are separate entities with their actions and the Authority has treated them as separate entities with[in] their CON processes." We agree with the Authority and find that FCSP's arguments to the contrary are belied by the record citing multiple incidences in which FCSP and PCAP were treated as separate entities by the Authority.

During arguments before the hearing examiner FCSP's executive director made statements to suggest that the June 13, 2023, letter was sent on behalf of FCSP,

---

[23] In support of its argument, FCSP relies upon the small print "acknowledgement" on the bottom of its letterhead titled Fayette Senior Programs indicating that "Fayette Senior Programs is owned and operated by [PCAP]."

[24] In its June 13, 2023, letter to the Authority objecting to Panhandle's CON application in 24-ICA-99, FCSP expressly noted that "[FCSP] is a 501c3 non-profit organization . . ." Moreover, in this letter, FCSP's Director states that he is "writing this letter on behalf of FCSP[.]"

instead of PCAP, because of an error made by FCSP's then-director (changing the name of PCAP to FCSP in a draft letter sent to FCSP's then-director by PCAP's executive director). We find no merit in this argument. If FCSP made some error in its June 13, 2023, letter by changing PCAP to FCSP, the record reflects no efforts were made by FCSP or PCAP to correct this alleged error. In fact, on July 17, 2023, a second letter was sent to the Authority by FCSP in which FCSP again asked that it, not PCAP, be identified as an affected party in 24-ICA-99, and requested a public hearing. Accordingly, based on the foregoing we find no clear error and no abuse of discretion in the Authority's dismissal of FCSP as an "affected party."[25]

As to summary judgment, Petitioners argue, in part, that the Authority's award of summary judgment to Panhandle was improper, as the hearing examiner lacked authority to grant summary judgment. We agree and find that the hearing examiner improperly awarded summary judgment to Panhandle in the underlying cases.

West Virginia law on the entitlement to a public hearing by affected persons in CON application cases is clearly stated. W. Va. Code R. § 65-32-8.11 mandates that the

---

[25] We note that no argument was advanced by any party that FCSP was improperly identified as an affected party in 24-ICA-100, 24-ICA-122, and 24-ICA-123. As no argument was raised by any party as to FCSP in the aforementioned cases, we do not address FCSP's "affected party" status in those cases.

"Authority **shall** hold a public hearing on [a CON] application if it is requested within the time period . . . by any affected person." (Emphasis Added).

As the SCAWV referenced in *Clark*:

> use of the term "shall" in a statute means that the agency to which the statute is directed must carry out the action described therein; it may not use its own discretion with regard to whether the described action should or should not be performed. *See* Syl. Pt. 4, *Am. Tower Corp. v. Common Council of City of Beckley*, 210 W. Va. 345, 557 S.E.2d 752 (2001) ("It is well established that the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation." (citing Syl. Pt. 1, *Nelson v. W. Va. Pub. Emps. Ins. Bd.*, 171 W. Va. 445, 300 S.E.2d 86 (1982) and Syl. Pt. 1, *E.H. v. Matin*, 201 W. Va. 463, 498 S.E.2d 35 (1997))).

*Id.* at *4. Additionally, in *W. Va. Dep't of Hum. Serv. v. David B., et al*, 251 W. Va. 217, ___, 911 S.E.2d 884, 895 (2024), the SCAWV recognized that

> "[L]egislative rules in West Virginia are authorized by acts of the Legislature and we have treated them, as they should be, as statutory enactments." *Appalachian Power Co. v. State Tax Dep't*, 195 W. Va. 573, 584, 466 S.E.2d 424, 435 (1995). Hence, "[o]nce a disputed regulation is legislatively approved, it has the force of a statute itself." *Id.* at 585, 466 S.E.2d at 436; *see also* Syl. Pt. 2, in part, *W. Va. Health Care Cost Rev. Auth. v. Boone Mem'l Hosp.*, 196 W. Va. 326, 472 S.E.2d 411 (1996) ("Once a disputed regulation is legislatively approved, it has the force of a statute itself. Being an act of the West Virginia Legislature, it is entitled to more than mere deference; it is entitled to controlling weight."); *Penn Virginia Operating Co., LLC v. Yokum*, 242 W. Va. 116, 120, 829 S.E.2d 747, 751 (2019) ("A legislative rule has the force of a statute[.]"); *Summers v. W. Va. Consol. Pub. Ret. Bd.*, 217 W. Va. 399, 405, 618 S.E.2d 408, 414 (2005) (per curiam) ("[L]egislative rules have the force and effect of statutes[.]"); *Feathers v. W. Va. Bd. of Med.*, 211 W. Va. 96, 102, 562 S.E.2d 488, 494 (2001)

24

("[W]hen regulations enacted by an agency have been legislatively approved, they have the force of statutes and are interpreted according to ordinary canons of statutory interpretation."); *Men & Women Against Discrimination v. Fam. Prot. Servs. Bd.*, 229 W. Va. 55, 60, 725 S.E.2d 756, 761 (2011) (per curiam) ("In considering the validity of legislative rules . . . we give those rules the same weight as we would give a statute.").

Here, there is no dispute that PCAP and SCCOA, as affected persons, requested a public hearing within the appropriate time frame. W. Va. Code R. § 65-32-8.11 is explicit and clear and does not give the hearing examiner any discretion in conducting a public hearing, but, instead, mandates that a public hearing be held, if the request is timely made. Accordingly, we find the Authority's hearing examiner's award of summary judgment to Panhandle was clear error.[26]

At oral argument before this Court, Panhandle suggested that the Rules of Civil Procedure have been incorporated in all Authority proceedings and, accordingly, a

---

[26] The Authority argues that the hearing examiner's authority to award summary judgment is inherent in its power to resolve contested cases set forth in West Virginia Code § 29A-5-1(d)(3),(5),(6). While we acknowledge the arguments of the Authority in this regard, we are mindful of the Authority's further acknowledgement that "West Virginia authorities have not explicitly examined whether agencies have summary judgment power under the State's APA."

While the Authority cites instances in which federal authorities have recognized an agency's authority to grant summary judgment under the federal APA, we find that it is unnecessary for this Court to examine the mechanism of awarding summary judgment in CON cases before the Authority, as West Virginia statutory law provides the clear and absolute right to a public hearing for affected persons who timely request the same. The right to a public hearing for affected persons who timely request said hearing is clear and must be applied by this Court.

25

motion for summary judgment was an appropriate action contemplated under those Rules. However, a review of the applicable rules and regulations reveals that the West Virginia Rules of Civil Procedure were only adopted with respect to discovery procedures. *See* W. Va. Code R. § 65-32-8.25 ("The affected parties may engage in discovery as provided by the West Virginia Rules of Civil Procedure."). Thus, we find no merit in Panhandle's argument in this regard.

Accordingly, based on the foregoing, we reverse the hearing examiner's award of summary judgment to Panhandle, and remand these matters (24-ICA-98 and 24-ICA-99) back to the Authority and direct that the hearing examiner enter an order consistent with this opinion and provide PCAP and SCCOA their requested public hearing on Panhandle's CON applications.

Further, we note that even if the hearing examiner had discretion to award summary judgment in the underlying cases, such an award was improper, as summary judgment was awarded prior to the evidentiary public hearing, at which PCAP and SCCOA would have had the opportunity to discover additional evidence in support of their positions. "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963). The SCAWV has long recognized that

26

> [a]s a general rule, summary judgment is appropriate only after adequate time for discovery. *See* [*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)]. A party opposing a motion for summary judgment must have a reasonable "opportunity to discover information that is essential to [its] opposition" to the motion. *See Anderson* [*v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)].

*Poweridge Unit Owners Ass'n v. Highland Props, Ltd.*, 196 W. Va. 693, 701, 474 S.E.2d 872, 881 (1996). In the instant cases, PCAP and SCCOA argued before the hearing examiner that they had not yet "put on [their] cases," as they anticipated collecting supportive testimony and other evidence at the public hearing to further develop their arguments in opposition to Panhandle's CON applications. We agree with PCAP and SCCOA and find that, under the limited facts and circumstances present in the underlying cases, even if summary judgment were a permissible option for the hearing examiner, that it was not proper. As our rulings on these two issues are dispositive of Petitioners' claims as to Panhandle, we decline to address the remaining assignments of error raised by Petitioners in 24-ICA-98 and 24-ICA-99, as they are rendered moot by our rulings.

### Cases 24-ICA-97, 24-ICA-100, 24-ICA-122, and 24-ICA-123

*Facts and Procedural Background*

On June 12, 2023, the Authority received individual CON applications from STHC, Elder, and Southern seeking to provide PC Services in various named counties. Thereafter, on June 26, 2023, the Authority received a CON application from Village seeking to provide PC Services in specifically noted counties. On July 13, 2023, PCAP wrote to the Authority, by separate letter for each of the underlying CON applications, to

27

object to each of Respondent Providers' CON applications, to identify itself as an affected person under West Virginia Code § 16-2D-2(1), and to request a public evidentiary hearing in each case. Similarly, FCSP wrote to the Authority, by letters dated July 16, 2023 (in STHC case) and July 17, 2023 (in Village and Elder cases), and made similar requests seeking affected party status, requesting a public hearing and levying an objection to STHC, Village, and Elder's CON applications.[27]

The parties thereafter exchanged discovery and "relevant documents were made part of the record." On September 25, 2023, pretrial hearings were individually held before the Authority's hearing examiner in the STHC and Elder cases and a public evidentiary hearing held on October 4, 2023 (in the Elder case) and October 5, 2023 (in the STHC case). A pretrial conference was held before the hearing examiner in the Southern case on October 19, 2023, and a public evidentiary hearing was held on October 25, 2023. As to the Village case, a pretrial conference was held before the hearing examiner on November 1, 2023, and a public evidentiary hearing was held on November 14, 2023. At each of the public hearings, "testimony was entered into the record by both parties" and each hearing was presided over by the Authority's hearing examiner.

Thereafter, each of the Respondent Providers filed briefs in support of their individual CON applications, to which Petitioners responded and objected. Respondents

---

[27] FCSP is not a Petitioner in 24-ICA-123.

28

then filed reply briefs, again in support of their individual CON applications. Ultimately, on February 7, 2024 (in 24-ICA-100) and February 21, 2024 (in the 24-ICA-97, 122, and 123), the Authority granted each of Respondent Providers' CON applications, in individual decisions. It is from the Authority's decisions granting Respondent Providers' CON applications that Petitioners now appeal.

*Discussion*

On appeal, Petitioners raise five assignments of error, which we have combined and reordered for purposes of efficiency. *See generally Critchley*, 229 W. Va. 396, 402, 729 S.E.2d 231, 237 (2012). In two of their assignments of error, Petitioners argue that the 2023 PC Standards were arbitrary and capricious with respect to the need methodology and caused the Authority to identify an unmet need in the proposed service areas that did not actually exist. Further, Petitioners suggest that the Authority erred in finding that Respondent Providers' applications would not have a negative effect on the community by significantly limiting the availability of other resources, such as nutrition and transportation services. Next, Petitioners contend that the Authority showed clear bias below, constituting an abuse of power. Lastly, Petitioners argue that the Authority erred in granting Elder's CON application, while it was "involved in pending litigation with the State of West Virginia for Medicaid fraud."

We begin with Petitioners' arguments related to the alleged arbitrary and capricious nature of the 2023 PC Standards promulgated by the Authority. Specifically,

29

Petitioners take issue with the Authority's use of the 3% multiplier in the need methodology calculation (in the 2023 PC Standards), as opposed to the 1.25% multiplier (used in the 2016 PC Standards), and suggest that the 3% multiplier was decided based upon pure conjecture, speculation, and an unfounded rumor that subcontracting of CONs was going to be prohibited in the future. Conversely, Respondent Providers argue, and we agree, that the 2023 PC Standards were not arbitrary and capricious and were properly enacted via the processes and procedures outlined in West Virginia Code § 16-2D-6, citing the testimony of Timothy Adkins, the Authority's CON program director, regarding the revised 2023 PC Standards, specifically the need methodology multiplier increase.[28]

---

[28] As noted in the Authority's Decision in 24-ICA-123, approving Respondent Southern's CON application, the Authority determined that the 2023 PC Standards, including the revised need methodology, were "rationally based." In support of its findings, the Authority cited to the testimony of Timothy Adkins, who testified, during a public hearing, that:

> The 1.25 percent, initially when we wrote these standards in 2016, that was to be 2.5 percent, and that was after the research that was done, they said, we really think it may need to be 2.5 percent. However, just about the time that happened and we [were] getting ready to present these for comment, Medicaid went through a crisis. Well, there was something in the paper that said that Medicaid was going to lose $40 million, and we had different ones coming and calling us saying, we can't do that. The 2.5 is too much. So that's where the 1.25 came from.

Further, Mr. Adkins, testified that

> [I]nitially, it was going to be 2.5. We did not --- when we [were] getting ready to submit these standards for public comment, there was an article back in 2016 that Medicaid was going to be under about $40 million. And the board made a decision then, well, we're not going to raise to 2.5, let's do it to 1.25. That's how the 1.25 was developed.

West Virginia Code § 16-2D-6 addresses the procedures by which the PC Standards can be amended by the Authority. Here, the record reflects that the Authority followed the procedures outlined in § 16-2D-6 when amending the PC Standards in 2023, and that said standards were, ultimately, approved and signed by West Virginia's Governor on April 27, 2023, well in advance of the underlying CON applications filed by Respondent Providers herein.[29] Accordingly, while PCAP and FCSP may not personally agree with the 2023 amendments to the PC Standards, as the Authority revised these PC Standards in

---

Mr. Adkins stated that he reviewed "enrollment numbers" from BMS and that two percent of West Virginia's Medicaid recipients were already receiving PC Services and, accordingly, "the 2016 [PC S]tandards' 1.25% multiplier needed to be raised to accurately reflect the need for PC services." Based upon this testimony, and the increased age in West Virginia's population since 2016 (increasing need for PC Services), the Authority found that its "2016 research already indicated that the multiplier should be at 2.5% to accurately reflect the need for PC Services, much closer to the current 3.0% than the previous 1.25%."

Moreover, the Authority found nothing improper or "unsound" in its reliance on BMS' representations regarding its intent to eliminate subcontracting (via statements BMS' representatives made to Mr. Adkins in multiple telephone conferences). Accordingly, the Authority found, and we agree, that it was not "irrational for the Authority to consider BMS' plans in developing its standards[,]" as such practice was specifically contemplated by West Virginia § 16-2D-6(e), which provides that the Authority, in revising its CON Standards "may consult with or rely upon . . . recommendations and practices of other health planning agencies and organizations, . . . [and] recommendations from third-party payors[.]"

[29] We acknowledge an alleged factual dispute below about the Authority's convening of a "task force" with regard to the amendment of the 2023 PC Standards and clarify that the record clearly reflects that a task force meeting to discuss the amendments to the 2023 PC Standards was held by the Authority on September 29, 2022. In its appellate briefs before this Court, PCAP admits that it had notice of and participated in the September 29, 2022, task force meeting. Further, we clarify that West Virginia Code § 16-2D-6 does not specifically mandate or contemplate the holding of multiple meetings of task force(s), or that said meetings must reach a certain time threshold to be considered as a task force meeting, as suggested by PCAP on appeal.

31

compliance with the procedures outlined in West Virginia Code § 16-2D-6, we find no error. The 2023 PC Standards were not created by the Authority within a vacuum, but were the result of the collaborative process required by the Legislature and outlined in West Virginia Code § 16-2D-6. This process included the Authority receiving input of those providing PC Services in West Virginia. These providers suggested changes and comments upon the proposed standards. The standards were ultimately approved by the Governor.[30] Accordingly, we find the Authority's 2023 PC Standards were not arbitrary and capricious and the Authority's reliance upon them in the consideration of Respondent Providers' CON applications below was not clear error.

Further, we disagree with Petitioners' argument that the Authority's finding that granting Respondent Providers' CON applications would have no negative effect on the community by significantly limiting the availability and viability of "other services" or providers, was clearly wrong. Here, Petitioners suggest that granting Respondent Providers' CON applications would cause Petitioners to limit their nutritional and transportation programs in the respective counties at issue. However, as the Authority found in its Decision in 24-ICA-123, "transportation and nutrition services are not regulated by CON law." Moreover, as the Authority stated in the Southern Decision,

---

[30] We note that the Authority's decision in 24-ICA-123 reflects that "the Authority not only received comments from task force members and the public [as to the proposed 2023 PC Standards (before they were presented to the Governor for approval)], it made changes to the proposed standards based on these comments."

32

"[b]ecause PCAP's nutrition and transport programs are not 'health services' as defined by West Virginia Code § 16-2D-2(18), they are not within the scope of the Authority's jurisdiction."[31]

---

[31]In its Southern Decision, the Authority further discounts PCAP's arguments citing the testimony of Timothy Adkins (program director of the Authority) during an October 13, 2023, hearing, which PCAP purports describes transportation and nutrition programs as "other services" described in criteria two of the 2023 Proposed Standards need methodology. PCAP makes similar arguments before this Court and contends that Mr. Adkins testified that:

| | |
|---|---|
| Q: [Attorney Walters]: | . . . So read that, and tell me what you're referring to. |
| A: [Mr. Adkins]: | Will the loss of revenue prevent other services from being provided? We know that --- that the providers use those dollars for other services. |
| Q: [Attorney Walters]: | And that's, and obviously then it was concern of yours? |
| A: [Mr. Adkins]: | It --- it's still a concern of mine. |
| Q: [Attorney Walters]: | And we don't have the transcript of it, but when we were --- when you were in that meeting, you were walking through the --- the three elements for a CON application. You talked about need, and then when you got to the second element and it's in the standards you got there. On page three, post services will not have a negative effect on the community by significantly limiting the availability and viability of other services. You --- you brought that up again, and I think your specific comment was you don't want to be in a situation where you're robbing Peter to pay Paul? |

33

Additionally, we agree, as was concluded by the Authority in its Decision in Elder (24-ICA-122), there is simply no evidence that PCAP or FCSP would have to stop "offering meals, or transportation, or any other services" based upon the approval of the Respondent Providers' CON applications. As the Authority noted in its Elder Decision, PCAP's "2022 financials clearly indicate that it has over $4,000,000 in cash which could be used to provide transportation" and meal services. Moreover, we agree, as was argued by Southern herein, the key concern for this Court and the Authority to consider "is whether consumers will be able to access the PC Services they need [in each of the respective

---

| A: [Mr. Adkins]: | That's exactly right. |
| Q: [Attorney Walters]: | And you're referring about the same thing. Those --- those --- those fees that they're using provide the other services? |
| A: [Mr. Adkins]: | Right. |
| Q: [Attorney Walters]: | And --- and that applies to those other services in number two? |
| A: [Mr. Adkins]: | That's exactly right. |

Like the Authority below, we find that Mr. Adkins's testimony cannot be read to establish that nutrition and transportation services are "other services" to be considered when determining the second criteria under the 2023 PC Standards. In an excerpt from that same hearing, not cited by PCAP, Mr. Adkins clarified that he had no "power to make a decision [regarding what constituted other services] and approve it without --- the [Authority's] Board has to be, the Board is the ultimate Authority." Here, the Board, as the ultimate authority, found that "other services" did not include the transportation and nutrition services referenced by PCAP. This is further confirmed by the hearing examiner's Dismissal Orders in 24-ICA-98 and 24-ICA-99, in which the hearing examiner found that the ". . . Authority [has] held that the 'other services' must be related to the services at issue in the [CON a]pplication" and that the nutrition and transportation ("food delivery") services provided by PCAP were not such "other services."

34

counties], not whether PCAP will be able to maintain its market share." Accordingly, based on the foregoing, we find no error related to this assignment of error.[32]

We next turn to Petitioners' contention that they are entitled to appellate relief as the Authority, through the actions of its hearing examiner,[33] showed bias in the underlying proceedings constituting "a clear abuse of power." Initially, we note that Petitioners' arguments regarding bias are completely devoid of any supporting legal authority, a clear violation of Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure.

Moreover, the records herein reflect that despite multiples instances of what Petitioners describe as "bias[,]" that Petitioners did not seek to recuse or disqualify the Authority's offending hearing examiner. Additionally, our thorough review of the voluminous records of the underlying cases shows no bias. While Petitioners certainly

---

[32] We decline to address the parties' arguments regarding *Chevron U.S.A, Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984), as it is not necessary for this Court to address the Authority's "interpretation" of a statute, as the clear statutory law in West Virginia provides the explicit manner in which the Authority is to review CON applications and promulgate CON standards. With such clear statutory law, this Court has not relied upon the Authority's interpretation of any statute, thus rendering *Chevron* and its progeny inapplicable.

[33] The hearing examiner below has been noted, in other proceedings, as counsel of record of the Authority (including a 2023 action in the Circuit Court of Kanawha County challenging the 2023 PC Standards). That case, *Putnam County Aging Program, Inc., v. W. Va. Dep't of Health and Human Services*, Civil Action No. 23-C-775, was dismissed by the Circuit Court of Kanawha County on September 19, 2023.

disagree with the rulings of the hearing examiner, such disagreement is not tantamount to a "clear abuse of power." Accordingly, we find no error.[34]

In their last assignment of error, Petitioners argue that the Authority erred by granting Elder's underlying CON application while Elder was involved in a pending litigation with the State of West Virginia for Medicaid fraud (in the alleged amount of $151,907.79). Again, Petitioners' arguments on this issue are completely devoid of reference to any legal authority in support of this position, in violation of Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure. Despite this failure, we find no error. Here, the Authority's hearing examiner would not permit Elder representatives to be questioned during hearings in the CON application process regarding its pending fraud case, citing that the same was irrelevant to its CON application. We agree with the hearing examiner. Here, as the fraud case was still pending against Elder, the allegations against Elder were irrelevant to the Authority's consideration of Elder's underlying CON application, a wholly unrelated matter. As cited by the Authority, in *State v. Cook*, 81 W. Va. 686, ___, 95 S.E. 792, 794 (1918), the SCAWV has long reasoned that allegations standing alone "will not be considered as evidence . . . unless those allegations are made

---

[34] We find it important to note the SCAWV's long standing ruling in Syllabus Point 2 of *Varney v. Hechler*, 189 W. Va. 655, 434 S.E.2d 15 (1993) and West Virginia Code § 29A-5-1(d), which by their express terms "[permit] an administrative agency to designate any member within the agency to preside as a hearing examiner and [requires] that such hearing be conducted in an impartial manner. No inherent conflict of interest is created simply because such agency member serves as a hearing examiner."

out by affirmative evidence." Accordingly, we find no clear error with regard to this assignment of error.

## Conclusion

For the foregoing reasons, we reverse the Authority's award of summary judgment to Panhandle in 24-ICA-98 and remand the case back to the Authority with directions to reinstate the matter and conduct a public hearing, as required by W. Va. Code R. § 65-32-8.11. As to 24-ICA-99, we affirm, in part, the Authority's dismissal of FCSP as an "affected party." However, we reverse, in part, the Authority's award of summary judgment to Panhandle and remand the case back to the Authority with directions to reinstate the matter and conduct a public hearing. As to 24-ICA-97, 100, 122, and 123, we affirm the Authority's approval of the CON Applications of STHC, Village, Elder, and Southern at issue in the underlying cases.

Affirmed, in part, Reversed, in part, and Remanded with instructions.